Pamela B. Petersen
Arizona Bar No. 011512
**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Facsimile: (480) 905-2027
ppetersen@axon.com
Secondary: legal@axon.com

Garret G. Rasmussen
Antony P. Kim
Jonathan A. Direnfeld
Thomas Fu
**Orrick, Herrington & Sutcliffe LLP**
1152 Fifteenth Street N.W.
Washington D.C.  20005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
grasmussen@orrick.com
akim@orrick.com
jdirenfeld@orrick.com
tfu@orrick.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*

**IN THE UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA**

| | |
|---|---|
| AXON ENTERPRISE, INC., a Delaware Corporation,<br>　　　　　　　Plaintiff,<br>v.<br><br>FEDERAL TRADE COMMISSION, a federal administrative agency,<br><br>and<br><br>JOSEPH SIMONS, NOAH PHILLIPS, ROHIT CHOPRA, REBECCA SLAUGHTER, and CHRISTINE WILSON, in their official capacity as Commissioners of the Federal Trade Commission,<br>　　　　　　　Defendants. | Case No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**<br><br>(Jury Trial Demanded) |

**INTRODUCTION**

1.      Plaintiff Axon Enterprise, Inc. ("Axon") brings this case to challenge the unconstitutional structure and processes employed by Defendant, the Federal Trade Commission ("FTC" or "Commission"), to prohibit lawful mergers and extract unwarranted settlements. The FTC exists as a Constitutional anomaly. In one hand, it wields a mighty sword—the power to not only prosecute cases, but to judge them too; in the other, a massive shield—near-total protection from political accountability, with the Commissioners who direct its actions subject to neither democratic election nor at-will removal by the President. For decades, the agency has leveraged that power against American companies indiscriminately—including, most recently, Axon. No longer.

2.      Axon brings this case to take a stand for public safety and for technical innovation and advancement—hallmarks of the company since its founding.  For over 18 months, Axon has cooperated in an investigation by the FTC into its acquisition of Vievu LLC ("Vievu"), a lawful transaction under the antitrust laws that has had no anti-competitive effect.  Axon is eager to prove its case in any federal court in this country. But Axon cannot—and will not—accept the FTC's attempts to extort an irrational "settlement" through a biased adjudicative process that vests the Commission with the powers of prosecutor, judge, and jury in violation of the Due Process and Equal Protection guarantees of the U.S. Constitution. Instead, Axon seeks to demonstrate in a neutral forum that the FTC's accusations are baseless; that Axon's acquisition of Vievu, a significantly distressed company, benefited customers and prevented massive public safety program disruptions; and that its law enforcement partners have more choices today than ever before.

3.      On December 23, 2019, two days before Christmas, the FTC unequivocally told Axon, a manufacturer of non-lethal policing equipment such as body-worn cameras ("BWCs")

and digital evidence management systems ("DEMS"), that it must completely unwind its May 2018 acquisition of a small, struggling company named Vievu. Axon, which acquired Vievu to assume a multi-year contract with the New York City Police Department ("NYPD") that Vievu could not fulfill, offered to divest all assets it acquired from Vievu, all Axon improvements to Vievu's products, and even provide the buyer with $5 million in working capital.  But the FTC insisted on more: Axon must not only divest all acquired assets plus improvements, but also agree to grant whomever buys those assets a license to all of Axon's BWC and DEMS intellectual property and technology—technology Axon has invested 10 years and over $200 million in building from the ground up.  Indeed, the FTC itself described its demand as a "blank check" to take Axon's independently created intellectual property and customers.  The FTC's demand would not return the parties to the positions they held before the acquisition, when Vievu (equipped with its *own* intellectual property) was not a viable going concern or competitive constraint; to the contrary, it would stand up a new company (equipped with *Axon's* intellectual property) far stronger than Vievu ever was or could have become. In other words, the FTC is seeking to deprive Axon of its intellectual property without Due Process, an unprecedented ultimatum that sends a chilling message to the nation's technology-based industries.

4.     The FTC's aggressive demands are not supported by the evidence. At the time of acquisition, Vievu was effectively insolvent and had failed to invest in R&D for the fast-approaching, next generation of products being developed by a host of new competitors. And, Vievu's most technologically-advanced product, the LE5 BWC, suffered from multiple defects that created information security and officer safety risks. Vievu's products remain viable today only because Axon invested in numerous modifications at considerable expense.

5.      Axon's acquisition of Vievu has had no material effect on the competitive landscape. Indeed, in the year and a half post-acquisition, competition has only increased. Customers continue to be able to choose from any of a field of well-funded competitors, including Motorola/WatchGuard,[1] Panasonic, Coban, Mobile Vision, and BodyWorn by Utility; and because of low barriers to entry, several more competitors such as Getac, Intrensic/GoPro and Visual Labs have launched BWCs in recent years.  All of this competition has benefited customers. The FTC's insistence that Axon surrender a "blank check" for settlement is therefore without merit.

6.      Instead, the FTC's demand rests on a more fundamental calculation. The Commission is confident it can strong-arm Axon into settling because, unlike the Department of Justice ("DOJ"), which must pursue its merger challenges in federal court, the FTC has the option of initiating proceedings within the agency itself. What is more, the question whether a given merger will be reviewed by the DOJ or the FTC is arbitrary, and secretly negotiated between the agencies themselves. Indeed, the FTC has told Axon that if Axon does not unconditionally surrender within a matter of days, it will initiate exactly that type of proceeding in January 2020.

7.      The import of that threat is clear: in an administrative proceeding, the FTC will not only charge and prosecute the case, but also appoint the Administrative Law Judge ("ALJ") that presides over it. And if the FTC disagrees with the ALJ's ultimate decision on either the facts or

---

[1] At the time of the Vievu acquisition, Watchguard was Axon's biggest competitor. In July 2019, Motorola purchased Watchguard for $271 million with the FTC's blessing, despite the fact Motorola was already a formidable competitor in the BWC and DEMS space with large city references and whose market capitalization of $27.6 billion dwarfs Axon's at $4.3 billion. The Motorola/Watchguard combination now has 8 Major City Chief Association ("MCC") agencies, including Houston with more than 5,100 sworn officers, and at least 70 agencies with 100+ officers.

the law, the same Commissioners who voted to file the enforcement action against Axon have the right to review these findings de novo *and change them*. If that procedure sounds unfair, that's because it is. Indeed, a former FTC Commissioner himself described it as an "unhealthy and biased institutional process" that virtually guarantees an agency win. *See* Joshua D. Wright, Section 5 Revisited: Time for the FTC to Define the Scope of Its Unfair Methods of Competition Authority at 6 (2015).[2] As observed by Wright:

> The FTC has voted out a number of complaints in administrative adjudication that have been tried by administrative law judges *in the past nearly twenty years*. In each of those cases, after the administrative decision is appealed to the Commission, the Commission has ruled in favor of FTC staff and found liability. In other words, **in 100 percent of cases where the administrative law judge ruled in favor of the FTC staff, the Commission affirmed liability; and in 100 percent of the cases in which the administrative law judge [ ] found no liability, the Commission reversed. This is a strong sign of an unhealthy and biased institutional process.** By way of contrast, when the antitrust decisions of federal district court judges are appealed to the federal courts of appeal, plaintiffs do not come anywhere close to a 100 percent success rate—indeed, the win rate is much closer to 50 percent.

*Id.* (emphasis added, footnote omitted).

8.      The FTC's Commissioners are largely unaccountable. They are not only unelected by the People, but also shielded from removal by the President. And so, if they set their sights on an unwarranted and coercive merger remedy, there is nothing to stop them.

9.      Policing and public safety are, for obvious reasons, issues of significant societal importance. And at a time when deep divisions exist between law enforcement agencies and the communities they serve, Axon's mission to "Protect Life – Protect Truth" has helped bridge gaps

---

[2] Available at
https://www.ftc.gov/system/files/documents/public_statements/626811/150226bh_section_5_symposium.pdf

and unify communities using innovative technology. The technologies Axon develops (including body cameras and less-lethal weapons) help to protect both the police officers who use them and the citizens who interact with them, and these technologies command broad public support. *See, e.g.,* Cato Institute, Americans Overwhelmingly Support Equipping Police with Body Cameras (reporting that 89% of Americans support requiring police to wear body cameras).[3] But an FTC action against Axon could have significant consequences for both the company and public safety by diverting finite resources necessary for continued innovation and competitiveness.[4]

10.      The Constitution was designed to prevent exactly the kind of unfair, unaccountable, and unchecked governmental action being exercised against Axon. The "essential constitutional promise" of Due Process is the right to a "fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004). The FTC would deny Axon that right, by serving as prosecutor, judge, and jury in its own administrative process. Further, the promise of Equal Protection restricts the Government from arbitrarily treating one person different from another. Yet the FTC would deny Axon that right by subjecting it to a biased administrative proceeding with a preordained result—while other

---

[3] Available at https://www.cato.org/policing-in-america/chapter-4/police-body-cameras#_ftnref66

[4] In addition to ongoing investments to further innovate its BWC and DEMS products, solutions that scale the best and are the simplest to use, Axon is heavily investing in Records Management, Computer Aided Dispatch, and Artificial Intelligence product lines that will continue to make policing safer, more efficient, and more accountable. Axon is making these investments with an industry-leading focus on ethical and responsible innovation through its AI and Policing Technology Ethics Board. *See* https://www.axon.com/axon-ai-and-policing-technology-ethics. This includes development of automated license plate recognition ("ALPR") software to stay competitive with Motorola/Watchguard, which recently acquired similar technology via a $445 million acquisition of Vigilant Solutions.

companies, whose merger reviews are assigned to the DOJ, retain the right to litigate the merits of mergers before a neutral arbiter in federal court. Finally, Article II's Vesting Clause mandates that the federal law-enforcement power of the United States be ultimately controlled solely by the President, the People's only nationwide elected representative, and not unelected bureaucrats. But the FTC would deny Axon that protection as well, subjecting it to an unfair prosecution run entirely by Commissioners accountable to neither the People nor the President.

11.     Axon has filed this suit to vindicate its Vievu acquisition and its Constitutional rights to Due Process and Equal Protection under the law. It seeks to prove, before a neutral arbiter, that its actions were wholly lawful. And it will expose the unfair and unconstitutional procedures and structures employed by the FTC to extract unjustified remedies.

12.     This Court should end the abuses perpetrated by the FTC for far too long. It should declare the FTC's structure and biased procedures unconstitutional. And it should enjoin the FTC from subjecting Axon to its unfair and unconstitutional internal forum, adjudicating the legality of Axon's acquisition in this Article III court instead.

## PARTIES

13.     Axon is a Delaware corporation with its principal place of business at 17800 N. 85th Street, Scottsdale, Arizona 85255.

14.     The FTC is an independent administrative agency of the United States. Among other things, the FTC is empowered to initiate administrative proceedings pursuant to Section 5(b) of the Federal Trade Commission Act ("Act"), and to seek injunctive relief in federal district court pursuant to Section 13(b) of the Act.

15.     Joseph Simons, Noah Phillips, Rohit Chopra, Rebecca Slaughter, and Christine Wilson (collectively "Commissioners") are Defendants in their official capacity as Commissioners of the FTC.

## JURISDICTION AND VENUE

16.     This action arises under the Constitution and laws of the United States, and this Court has federal question jurisdiction over this action pursuant to Article III of the Constitution and 28 U.S.C. § 1331.

17.     Plaintiff's right to immediate judicial review in this Court with respect to Defendants' alleged conduct is based on the Due Process Clause of the Fifth Amendment, the Administrative Procedure Act, 5 U.S.C. §§ 702, 704, and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

18.     Venue is proper under 5 U.S.C. § 703 and 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

**A.    Axon's Acquisition of Vievu—A Failing Company.**

19.     In 1993, Rick Smith formed the company that is now Axon to design less-lethal conducted energy weapons for police departments.

20.     Axon unveiled its first BWC, the Axon Pro, in 2008. This camera was head-mounted and uploaded footage for online storage to a cloud-based evidence management software now known as Evidence.com. This innovative product revolutionized digital evidence collection, storage and retrieval and won the 2009 Innovation Top Software Award by the Cygnus Law Enforcement Group presented at the International Association of Chiefs of Police annual conference. Axon's DEMS solution was thus developed, launched and commercially successful

long before its competition, including Vievu, which did not announce its "Veripatrol" cloud-based DEMS offering until February 2015. Prior to 2015, Vievu only offered local, on-premise DEMS.

21.     Axon's first contracts for its BWCs and DEMS were with small police departments. Axon received a big boost in 2009, when a police officer involved in a lethal-force incident was exonerated based on footage from an Axon camera. The company received another boost in April 2013, when the Rialto, California Police Department released a study showing an 88% drop in complaints against police officers that coincided with the use of Axon cameras.

22.     Vievu was founded in 2007 by a former Axon employee and was acquired by Safariland LLC in 2015. Safariland is a privately-owned reputable provider of safety and survivability products for public safety such as body armor and holsters. But Safariland had no experience in software development and soon determined it was in over its head without the engineering expertise required to support DEMS products and keep pace with competitor advancements. It therefore significantly cut back on research and engineering investments.

23.     Although an early leader in BWC sales, by 2016 Vievu was "teetering on irrelevance among major departments," as recognized by a market analyst at the time,[5] having failed to invest in R&D and next generation products to stay competitive. Then in October 2016, Vievu threw a "Hail Mary", offering to supply more than 20,000 BWCs and a DEMS solution on unsustainable terms (at roughly one-third of Axon's bid price). This 5-year contract, terminable at will, proved to be Vievu's downfall.

---

[5] *See* Craig-Hallum Capital Group LLC, Oct. 3, 2016 Institutional Research Note, opining that Vievu's pricing on its NYPD bid was "an attempt to remain relevant" but "likely results in a significantly unprofitable contract for Vievu."

24.     On May 3, 2018, Axon announced its acquisition of Vievu for approximately $7 million in guaranteed upfront cash and stock—a testament to the company's failing status.[6] By that time, Vievu was essentially insolvent. It won its largest contract, the NYPD, at a price that was driving unsustainable economic loss, and had not won any major contract thereafter because the NYPD body camera rollout was consuming all its resources. Its parent company, Safariland, lacked the resources to support Vievu, which was losing nearly $1 million *per month*. Vievu's trajectory was irreversible. At the time Axon acquired it, Vievu had more than $19 million in debt owed to Safariland entities, another $8 million in off-balance-sheet purchase commitments, and the cash equivalent of less than three days' operating expenses. And despite Safariland's exhaustive attempts to shop Vievu to other potential buyers, there were no takers. Vievu came to Axon as a last resort.

**B.     The FTC's Excessive and Unwarranted Settlement Demand.**

25.     On or about June 14, 2018, the FTC sent Axon a letter indicating it was investigating the Vievu acquisition.  At that point, Axon had not taken any material steps toward transitioning Vievu's customers to Axon, for example, by shifting them from Vievu's products to Axon's product and technology offerings. Instead, Axon was honoring all of Vievu's customer contracts.

26.     Axon cooperated in the FTC's investigation. Over the course of more than 18 months, Axon produced more than 262,000 documents, provided reams of data and other

---

[6] Deal terms also included approximately $6 million in additional common stock, contingent upon achieving certain milestones over two years, which have been partially met, and an ancillary minimum holster purchase commitment with Safariland.

information, and produced multiple executives for investigational depositions. At no point did the FTC request (or even suggest) that Axon "hold separate" the Vievu business or assets.  At no point did the FTC request (or even suggest) that Axon avoid transitioning Vievu's customers to Axon's superior products and technology platform.

27.     Rather, after more than 18 months, the FTC threatened to sue Axon in an internal administrative hearing where the outcome is all but guaranteed. The FTC made clear, in at least three face-to-face meetings, that Axon's only hope for avoiding litigation was to surrender a "blank check" divesture. The FTC told Axon it would unilaterally dictate the terms of settlement from a "menu" of all Axon's customers and contracts (not just those won post-acquisition), Axon's intellectual property and technology, Axon employees, and any ancillary services and support functions the FTC deemed necessary. Remarkably, the FTC described its vision of "re-creating" Vievu into a virtual "clone" of Axon armed with Axon's own intellectual property—something that Vievu never was nor could be without impermissible government regulation of, and unwarranted interference in, a highly-competitive marketplace.

28.     The FTC's arbitrary take-it-or-leave-it demand is possible only because this governmental agency lacks any real accountability to the Constitution's requirements of Due Process or Equal Protection, or to the tenets of antitrust merger law.

**C.     The Government Merger Review Process.**

29.     The FTC and the DOJ Antitrust Division have dual jurisdiction for reviewing mergers and acquisitions that may present substantive antitrust concerns. Section 7 of the Clayton Act, codified at 15 U.S.C. § 18, prohibits mergers and acquisitions where the "effect . . . may be substantially to lessen competition" or "tend to create a monopoly." Both the DOJ and FTC have

authority to file suit to block a proposed transaction on antitrust grounds. The DOJ's authority to sue is rooted in Section 15 of the Clayton Act, and the FTC's authority is based on Section 13(b) of the FTC Act.

30.     Because the DOJ and FTC have dual-jurisdiction to review mergers, the agencies have created a "clearance" process to decide which agency will investigate a merger. Over the years, the agencies have reached a series of informal, non-public understandings as to how they will divvy up merger investigations. Clearance is an opaque, black-box process. The agencies maintain complete control over the structure and implementation of the clearance process and have total discretion to decide which agency will undertake a particular merger investigation.  Merging parties have no insight or input into which agency will investigate their merger. Moreover, clearance rules and procedures are not mandated by statute, subject to Congressional scrutiny, or promulgated through notice-and-comment rulemaking.

31.     Which agency reviews a consummated transaction is critical. The DOJ's only means of unwinding a consummated merger is to sue in federal court. *See United States v. Parker-Hannifin Corporation,* No. 1:17-cv-01354-UNA (Sept. 26, 2017) (DOJ lawsuit brought to "unwind" transaction "by means of an order requiring defendant . . . to divest" the defendant's assets or the acquired entity's assets). The FTC, on the other hand, has the option to sue in federal

court under Section 13(b) of the Act,[7] or to commence an internal administrative hearing before either a single Commissioner or an ALJ on the FTC's payroll.

32.     The FTC's internal administrative hearing provides none of the substantive or procedural protections enjoyed by litigants in federal district court. These proceedings are, instead, fraught with Due Process and Equal Protection deficiencies.

- ▪ Federal district court judges are Article III impartial fact-finders who owe no allegiances to the DOJ.  In contrast, any FTC Commissioner (including one who voted to sue the defendant) is permitted to preside over the administrative hearing; and, at best, an ALJ appointed by the FTC and on the FTC's payroll will preside.

- ▪ Federal court proceedings are governed by the Federal Rules of Evidence and Federal Rules of Civil Procedure. Neither apply in FTC administrative proceedings.

- ▪ The DOJ must satisfy a more rigorous standard of finding that a merger or acquisition "substantially lessens competition," whereas the FTC can satisfy a less onerous "unfair competition" standard in the administrative context.

---

[7] Section 13(b) of the FTC Act provides, in relevant part, that *"[w]henever the Commission has reason to believe that any person, partnership, or corporation is violating, or is about to violate, any provision of law enforced by the Federal Trade Commission, and that the enjoining thereof pending the issuance of a complaint by the Commission and until such complaint is dismissed by the Commission or set aside by the court on review . . . would be in the interest of the public*—the Commission by any of its attorneys designated by it for such purpose may bring suit in a district court of the United States to enjoin any such act or practices. . . and  in proper cases the Commission may seek, and after proper proof, the court may issue, a permanent injunction.*"* 15 U.S.C. § 53(b) (emphasis added).

13

- Litigants in federal court can appeal adverse decisions to impartial circuit court judges. Decisions rendered in FTC administrative proceedings must first be appealed to the same FTC Commissioners who voted to sue the defendant at the outset.

- The DOJ cannot change the findings made by the district court when appealing a decision to the circuit court. However, the FTC Commissioners, on appeal, can ignore and completely change the merits decision rendered in the administrative proceedings *before* the defendant appeals to the circuit court.

- Different appellate standards of review also apply depending on where the case originated. The district court's factual findings in a DOJ case are reviewed for "clear error," whereas "[t]he findings of the Commission as to the facts, if supported by evidence, shall be *conclusive*." 15 U.S.C. § 45(c) (emphasis added).

33.     Given the inherently biased and unfair nature of administrative hearings at the FTC and the limited review of its factual findings on appeal, it is no surprise that the agency believes itself to be virtually untouchable in its internal arena. Indeed, that belief was on full display when the FTC insisted that Axon not only divest the assets it actually acquired in the Vievu merger, but also provide the FTC with "a blank check" to create a new competitor far stronger than Vievu ever was (or could have been) by forcing Axon to license its own intellectual property developed over 10 years at significant investment expense. The agency will not accept anything less. In a December 2019 face-to-face meeting with Axon's counsel, the FTC specifically threatened to extract its extraordinary relief from Axon one way or another—either voluntarily through settlement, or forcibly through its internal administrative process. Such an aggressive demand reflects a negotiating posture taken only by a party that believes it cannot lose. But because the

14

FTC intends (if no settlement is reached) to litigate, not before a neutral arbiter, but in an administrative proceeding over which it has ultimate control and which has proven futile for defendants, it has no reason to temper its demands.

34.     This kind of sham hearing process is exactly what the Due Process Clause was designed to prevent. As the Supreme Court has emphasized, the irreducible minimum of Due Process is "notice of the factual basis" of the Government's assertions "and a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi,* 542 U.S. at 533. Indeed, "[f]or more than a century, the central meaning of procedural due process has been clear: 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right … an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.'" *Id.* (quoting *Baldwin v. Hale,* 1 Wall. 223, 233 (1864)). And a "meaningful" hearing, for purposes of Due Process, "requires a neutral and detached judge." *Id.* (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 617 (1993)). "These essential constitutional promises may not be eroded." *Id.* And yet that basic protection—provided to everyone from public employees to enemy combatants—is denied to companies caught up in a merger challenge pursued by the FTC.

35.     The fact that only some companies—namely, those that happen to have their mergers investigated by the FTC and not the DOJ—are subject to those unfair procedures only emphasizes their Constitutional infirmity. There is no rational basis for denying companies faced with a merger challenge brought by the FTC of the basic protections they would (and other companies do) enjoy in a merger challenge brought by the DOJ. That is especially so given that the choice of whether a challenge is brought by the DOJ or the FTC is sorted out by the agencies

themselves. The law has long been skeptical of the Government's ability to circumvent legal protections by arranging proceedings so that one entity takes an action that the other cannot. *See Elkins v. United States,* 364 U.S. 206, 224 (1960) (ending the "silver platter doctrine"). If the promise of Equal Protection means anything, it is that the Government cannot arbitrarily choose which persons it deems worthy of more or fewer legal protections.

**D.    The FTC Lacks Any Political Accountability.**

36.    Worse still, the FTC lacks any political check on how it exercises its unfair procedures against the companies that happen to fall within its bailiwick. Although Article II "vested" all "executive Power" in the President, Art. II, § 1, cl. 1, and charged the President alone with "tak[ing] Care that the Laws be faithfully executed," Art. II, § 3, the FTC enforces the antitrust laws outside of Presidential control.

37.    As the Supreme Court has explained, the Framers concentrated Executive power solely in the President to "ensure … accountability" in the Executive Branch. *Printz v. United States,* 521 U.S. 898, 922 (1997). They recognized that the President could not carry out all of his duties alone, and therefore, must be able to delegate some authority and responsibilities to others. *See* Art. II, § 2, cl. 2 (discussing appointments of superior and inferior officers); *Myers v. United States*, 272 U.S. 52, 117 (1926) ("the President alone and unaided could not execute the laws," and thus must "select those who [are] to act for him under his direction in the execution of the laws.").

38.    But the Framers feared the obvious mischief that could be worked by such unelected individuals armed with law-enforcement power. Thus, the Framers struck a balance. On the one hand, they allowed the President to delegate power; on the other, they took care to ensure that the President was always the one with whom "the buck stops." *Free Enterprise Fund v.*

*PCAOB,* 561 U.S. 477, 493 (2010). Accordingly, the Supreme Court has recognized that, "as a general matter," the President must have the "power to remove" principal officers "who assist him in carrying out his duties." *Id*. at 513-14. Indeed, if "any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, *and controlling* those who execute the laws." *Id*. at 492 (quoting 1 Annals of Cong. 463 (1789) (Joseph 8 Gales ed., 1834) (Madison) (emphasis added)).

39.     Just as the President's ability to select administrative officers "is essential to the execution of the laws by him, so must be his power of removing those for whom he cannot continue to be responsible." *Myers*, 272 U.S. at 117. That removal power is crucial to the democratic legitimacy of the Executive Branch in two ways: First, it makes inferior officers less likely to deviate from the President's (and hence, the People's) will. An officer who knows that disobedience can (and will) be met with removal is less likely to take an action at odds with the President's agenda. Second, and perhaps more important, the removal power gives the People political recourse if they are displeased with the actions taken by those who enforce federal law. Although the People cannot vote for (or against) an Executive officer directly, they can vote for (or against) the President, who bears ultimate responsibility for federal law enforcement. Those two mechanisms for accountability work together to ensure that the Government officials who carry out the work of the Executive Branch do so in a way that reflects the People's will, and not their own. As Alexander Hamilton wrote: If the Executive power were "subject, in whole or in part, to the control and co-operation of others," it would "deprive" the People of their "greatest securities" for the "faithful exercise of any delegated power"—namely, the "restraints of public opinion." The Federalist No. 70 at 424, 428-29 (Hamilton).

40.     FTC Commissioners, however, are shielded from at-will Presidential removal—and hence from the key mechanism of democratic accountability—in violation of Article II. The FTC is headed by five Commissioners, nominated by the President and confirmed by the Senate, each serving a 7-year term. 15 U.S.C. § 41. But once appointed, the Commissioners are not subject to removal by the President absent a finding of "inefficiency, neglect of duty, or malfeasance in office." *Id.*. This means FTC Commissioners are not politically accountable for their actions. So long as the Commissioners stop short of "malfeasance," the President can do nothing but stand by and watch, no matter how much he disagrees with them. Moreover, because the FTC-appointed ALJ can also only be removed for "good cause" in accordance with statutory procedures, 5 U.S.C. § 7521(a), (b)(1), an impermissible "dual-layer of protection" even further restricts Executive control. *See PCAOB*, 561 U.S. at 495 (holding unconstitutional similar multi-layer tenure protection where Board members appointed by SEC could only be removed by those Commissioners, not the President, for cause).

41.     This means that crucial law enforcement actions, sometimes with massive consequences for the American economy (and here, for public safety), are currently taken by individuals not elected by the People, and not controlled by the President. That runs directly contrary to Article II and the democratic principles underlying the Constitution. Indeed, the U.S. Government itself has acknowledged as much. In its recent merits brief filed in the U.S. Supreme Court in *Selia Law LLC v. Consumer Financial Protection Bureau,* No. 19-7 (Dec. 9, 2019),[8] the

---

[8] Available at https://www.scotusblog.com/case-files/cases/seila-law-llc-v-consumer-financial-protection-bureau/

Solicitor General stated that *Humphrey's Executor v. United States*, 295 U.S. 602 (1935)—a 1935 case upholding the Constitutionality of the FTC's removal structure—"should be narrowed or overruled," at least in the context of an agency headed by a single director. U.S. Br. 44. Much of the Government's reasoning, however, equally supports overruling *Humphrey's Executor* specific to the FTC's 5-member Commission.

42.     *Humphrey's Executor* was rooted on the mistaken notion that the FTC served quasi-legislative and quasi-judicial functions, rather than Executive law enforcement functions. The Government now concedes that "the reasoning for *Humphrey's Executor* does not withstand careful analysis. Even at the time of the decision, there was little reason to conclude that the FTC exercised anything other than executive authority." U.S. Br. 45. The Government further noted that the Supreme Court's decision in *Humphrey's Executor* "was concededly inconsistent with the exhaustive and careful reasoning of the *Myers* decision," which struck down as unconstitutional a law denying the President unrestricted power to remove first class postmasters, 272 U.S. at 176, and that "legal developments since *Humphrey's Executor* have only clarified that independent agencies exercise executive power—particularly those agencies like the CFPB [and the FTC] that have the authority to bring enforcement actions in federal court seeking civil penalties." U.S. Br. 45. Indeed, according to the Solicitor General:

> The Court's modern decisions, moreover, make crystal clear that agencies engaged in rulemaking and adjudicative functions are wielding executive power in the constitutional sense. Although "[a]gencies make rules * * * and conduct adjudications * * * and have done so since the beginning of the Republic," and "[t]hese activities take 'legislative' and 'judicial' forms," at bottom "they are exercises of—indeed, under our constitutional structure they *must* be exercises of—the 'executive Power' " when performed by the Executive Branch.

*Id.* at 31 (citing *City of Arlington v. FCC*, 569 U.S. 290, 304 n.4 (2013) (emphasis in original));
*see also id.* at 30 ("the exercise of rulemaking and adjudicative functions by such an agency is—
and must be—the exercise of *executive* power.") (emphasis in original).

43.     The Solicitor General is hardly the only one to recognize the unconstitutionality of
the FTC's structure. Indeed, numerous prominent scholars, members of Congress, and even States
have filed briefs in the *Selia Law* case criticizing *Humphrey's Executor*. Ilan Wurman of the Sandra
Day O'Connor College of Law at Arizona State University, for instance, authored a brief on behalf
of several separation of power scholars—including Stanford Law School professor and former
Tenth Circuit judge Michael W. McConnell—urging that the Court "should reconsider that
precedent altogether." Br. of Separation of Powers Scholars at 23. Similarly, 27 members of the
House of Representatives filed an amicus brief calling the basic premise of *Humphrey's
Executor*—that the FTC "did not exercise any executive power"—"dubious" and stated that the
case might come out "differently today if the same facts arose again." Br. of Twenty-Seven
Members of the U.S. House of Representatives at 7, 18. And no fewer than 13 States—Texas,
Alabama, Arkansas, Georgia, Indiana, Kansas, Louisiana, Nebraska, Oklahoma, South Carolina,
South Dakota, Utah, and West Virginia—attacked *Humphrey's Executor* as "thinly reasoned." Br.
of Texas et al. at 12. There is thus a large and growing consensus emerging that the FTC's structure
violates the basic tenets of Article II.

**E.     The FTC's Substantive Objections to Axon's Acquisition Are Meritless.**

44.     The FTC's unconstitutional structure, as well as its substantive and procedural
defects, have been laid bare in case after case. A particularly glaring example involves Axon's
small acquisition of Vievu—a transaction intended to bolster technology and innovation in public

safety and prevent the imminent disruption of BWC programs in several major law enforcement agencies, including NYPD. In addition to benefiting Vievu's customers, this transaction presented no risk of harm to competition, which is more robust today than ever before.

45.     To avoid this fact, the FTC has posited in its discussions with Axon a very narrow relevant market that includes only large metropolitan police departments (essentially the 69 MCC member agencies[9] out of 18,000 law enforcement agencies in the U.S.) requiring both BWCs and cloud-based DEMS (but excluding local on-premise DEMS used by many agencies, including MCC Nashville won by Watchguard in May 2019). The FTC has reverse-engineered an artificially constrained relevant market in order to claim that Vievu had high shares, when in actuality the NYPD alone skewed all of Vievu's numbers and was central to its financial downfall.

46.     Moreover, this type of gerrymandering is arbitrary and overly narrow because there is no distinction—and the FTC has not articulated one to date—between BWCs and DEMS offered to large police departments as compared to smaller agencies. Axon and many of its competitors offer the exact same products to both large and small police departments. And while BWCs and DEMS are complementary (police departments need a DEMS to offload and store footage created by BWCs), they are separate and distinct products. BWCs and DEMS perform different functions,

_____

[9] *See* https://www.majorcitieschiefs.com/. Association members are metropolitan cities and counties ranging in sworn officer size from 435 (Salt Lake City) to 36,228 (NYPD). Of course, lots of non-MCC member cities and counties are of equal size and significance; for example, VisioLogix won Rochester, NY with 747 officers, but is not within the FTC's definition so is ignored. The FTC's myopic focus also excludes Major County Sheriff Association ("MCSA") members as large as the LA County Sheriff's Department with 9,316 sworn officers—an agency that has not yet chosen a BWC or DEMS supplier (proposals are due January 9, 2020 and there will be no competitor shortage).

as demonstrated by the fact that police departments mix and match BWCs and DEMS and many competitors offer BWCs or DEMS, but not both. There is no void in the very crowded BWC space with more than 20 camera competitors.

47.     The FTC is also improperly discounting in-car video solutions commonly packaged today with BWC and DEMS in police department Requests for Proposals ("RFPs"), because Vievu did not have an in-car product and had no such product in development. At least 6 leading BWC/DEMS competitors also offer in-car video solutions (Motorola/Watchguard, Panasonic, Utility, Getac, Coban, and Digital Ally), causing Axon to launch its Fleet in-car offering in 2015 to stay competitive. Vievu's failure to invest in a dashboard camera solution put it at significant competitive disadvantage.  But not to worry, the FTC simply excluded in-car video from its market definition to artificially elevate Vievu's relevance.

48.     But even with the FTC's cherry-picked MCC definition of the market, at least 7 BWC competitors offer cloud DEMS (Motorola/Watchguard, Panasonic, Getac, Utility, Coban, Visual Labs/Samsung, and Digital Ally), 5 of whom have large MCC reference accounts.  Indeed, WatchGuard/Motorola have 8 MCC accounts, Panasonic has 3, and Utility has 2. And competitors Coban and Getac have won large non-member agencies like the California Highway Patrol (7,197 officers) and the Florida Fish & Wildlife Commission (806 officers).

49.     These manufacturers not only compete against Axon, they also beat Axon. Indeed, post-acquisition, Axon has lost at least 55 tenders with agencies of 100+ sworn officers to 10 separate companies:

- Watchguard (19 wins) – including MCC Nashville Metro PD, TN (1,398 officers)
- Utility (11 wins) – including St. Louis County PD, MO (880 officers)

- Panasonic (7 wins) – including Connecticut State Police (1,060 officers)
- Getac (5 wins) – including Toledo PD, OH (592 officers)
- Motorola (6 wins)
- L3/Mobile Vision (2 wins)
- Visual Labs (2 wins)
- Coban (1 win) – California Highway Patrol (7,197 officers)
- Safety Vision (1 win)
- Intrensic/GoPro (1 win)

And even when playing in the FTC's MCC-only sandbox, Axon lost both Nashville and El Paso to Watchguard in 2019.

50.     As these statistics demonstrate, the markets for BWC and DEMS (however those markets are defined) are also characterized by low barriers to entry. Recent entrants, including Getac and Visual Labs, have quickly gained traction. These dynamics are wholly inconsistent with any market power on Axon's part—the company simply cannot exclude other companies from competing, or deter entry by new players, or charge supracompetitive prices. These are not hypothetical arguments, but rather, based on the actual experience of what has come to pass in the more than 18 months since Axon acquired Vievu. Indeed, expansion by incumbent vendors and entry by new players is likely to continue because many police departments, including large metropolitan cities and counties, are open opportunities. At least half of the nation's largest 1,200 police departments and thousands of the 18,000 U.S. law enforcement agencies have yet to adopt BWCs and DEMS.

51.     Moreover, BWC and DEMS trade in bid markets with the price set by individual competitors in response to RFPs. And while Vievu was an early viable competitor, since at least 2015 customers rarely rated Axon and Vievu as each other's next-best competitor. And expert econometric analysis of opportunity data indicates that Vievu did not constrain Axon's pricing.

23

Axon did not discount more when Vievu was bidding, and Axon did not lose more bids when Vievu was bidding. Customers could and did turn to a number of other companies to buy their BWC and DEMS, including much larger vendors like Motorola and Panasonic. In 2017 alone, Axon faced stiff competition on bids from the likes of Motorola (10), Panasonic (18), and WatchGuard (45), demonstrating that these competitors have been and remain prominent.

52.     Indeed, pre-acquisition (between 2016 and May 2018), 4 competitors won 9 MCC accounts. Vievu, on the other hand, had no major city win after NYPD in 2016. At the time of acquisition, Vievu had no ability to bid on new BWC or DEMS contracts. In fact, new Vievu bids were essentially non-existent in 2017 and pre-acquisition in 2018. Vievu had locked itself into contracts that drove negative cash flow and significant operating losses. The very NYPD contract that led to the public appearance of a healthy business for Vievu had, in actuality, overwhelmed it, causing the firm to cancel nearly all of its research and development activities and to forego the development of cutting-edge features that its customers wanted and competitors offered. And because NYPD consumed all of Vievu's resources that might have otherwise gone to create next-generation products or effectively bid for other customers, Vievu had eliminated itself as a competitive threat.

53.     The low price that Vievu bid for the NYPD deal—roughly one-third of Axon's bid price—reflected the company's gamble that it could regain relevance at the expense of profit. Vievu similarly won a low-price contract with Oakland in September 2016, thus taking on two very large, resource-intensive obligations with very little margin for error. But Vievu could not deliver. In addition to security flaws, Vievu's DEMS was prone to losing or corrupting data and resulted in the Oakland Police Department losing 25% of its stored video footage during a software

upgrade—data typically needed to prosecute criminal trials. And what would have been the fatal blow for Vievu came only a few months after Axon's acquisition, when a Vievu LE-5 body camera's lithium battery caught fire and exploded, prompting the NYPD to pull thousands of those cameras off the street. Accordingly, pre-existing design flaws in Vievu's products made Vievu's exit from the market imminent. Instead, Axon was able to step in and invest in improvements to Vievu's products to better serve our country's public safety agencies, at considerable monetary cost to Axon, and ensure their body camera programs did not fail.

54.     Axon's acquisition of Vievu falls squarely within the "failing firm" safe harbor. Vievu was unable to meet its financial obligations in the near term and was effectively insolvent. And there were no viable buyers for Vievu. Safariland made substantial good faith efforts to sell Vievu, but no one was willing to make an offer let alone consummate a deal. Notably, Safariland approached Axon, not the other way around. The sale to Axon was its last and only option.

55.     Still, the FTC caused Axon to spend at least $1.5 million in legal fees (not to mention substantial internal resources and mission distraction) during an 18+ month investigation, before now threatening the company with a forceful unwinding of its Vievu acquisition. Even worse, the FTC insists on creating a new competitor with capabilities well beyond anything Vievu would have developed in the absence of the merger, by cloning Axon's independently-developed intellectual property and handing it to a third party—a strongarm demand wholly unsupported by viable antitrust theories of merger harm. This extreme remedy bears no relation to the Vievu that actually existed in May 2018 or could ever have existed today.

56.     The basic claim underlying all of the FTC's actions against Axon is thus without merit. Accordingly, the FTC seeks to hide behind its own biased procedures instead of meeting

Axon's arguments before a neutral arbiter. This Court should prohibit the agency from doing so. If the FTC wishes to challenge and unwind the Vievu consummated merger, it should do so in the same way the DOJ does: on the merits, in the open, in a federal court. Here, Axon will demonstrate that its acquisition of Vievu was lawful and not anti-competitive.

## COUNT I

### (Violation of Axon's Fifth Amendment Rights)

57.     Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

58.     The imminent administrative proceeding, in which the FTC will act as prosecutor, judge, and jury, violates Axon's Due Process rights, including but not limited to depriving Axon of the ability to make its case before a neutral arbiter.

59.     By arbitrarily subjecting Axon to unfair procedures before an administrative body, rather than to a fair trial before a neutral judge appointed in accordance with Article III of the Constitution with the procedural protections of a federal court, the FTC has violated Axon's Equal Protection rights.

60.     The Commission's conduct has caused and will continue to cause Axon to suffer immediate and irreparable harm to its Constitutional rights to Due Process and Equal Protection. No money damages can remedy this harm, and Axon has no legal avenue by which to recover any money damages against the Commission. Moreover, the FTC's administrative proceeding is not speculative. It will happen and happen imminently. The FTC has assured Axon of this fact.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT II**

**(The FTC's Structure Violates Article II)**

61.    Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

62.    The FTC's actions separately violate Axon's Constitutional rights because the agency's structure, on its face, is unconstitutional under Article II. In particular, Article II requires that Executive officials exercising law-enforcement power be removable at will by the President. Although the FTC clearly exercises law-enforcement power—including but not limited to Axon's case—its Commissioners are shielded from at-will removal. Moreover, ALJs appointed by the FTC, who also can only be removed for cause, create an impermissible dual-layer of insulation. Because the agency's structure violates Article II, any actions taken against Axon under its present structure are invalid.

**COUNT III**

**(Declaratory Judgment that Axon's Acquisition Did Not Violate Antitrust Laws)**

63.    Plaintiff restates and incorporates by reference each and every allegation of the preceding paragraphs.

64.    Axon's acquisition of Vievu did not violate Clayton Act § 7 or any other antitrust law. The acquisition was not likely to substantially lessen competition and in fact has not done so.

65.    At all relevant times, barriers to entry have been low, and the market for BWCs and the separate market for DEMs (however defined) was and remains highly competitive and subject to rapid change. A considerable number of police departments of all sizes have yet to adopt body camera technologies, creating endless opportunity for existing and new entrants.

66.     Both before and after Axon's acquisition of Vievu, there were and have been strong competitors and new entrants. These competitors and entrants have enhanced competition in the marketplace.

67.     At no time has Axon engaged in supracompetitive pricing, nor could it.

68.     At the time of the acquisition, Vievu was a failing company.

69.     In sum, for all the foregoing reasons, Axon's acquisition of Vievu was and remains lawful.

## PRAYER FOR RELIEF

WHEREFORE, Axon respectfully requests that this Court enter judgment in its favor and against the FTC as follows:

a.  Declare the FTC's structure unconstitutional;

b.  Declare the FTC's administrative procedures unconstitutional;

c.  Declare that Axon's acquisition of Vievu was lawful;

d.  Enjoin the FTC and its Commissioners from pursuing an administrative enforcement action against Axon.

e.  Award Axon its reasonable costs incurred in bringing this action; and

f.  Award such other and further relief the Court deems just and proper.


Dated: January 3, 2020                          Respectfully Submitted,


                                                */s/ Pam Petersen*
                                                Pamela B. Petersen
                                                Arizona Bar No. 011512

**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Facsimile: (480) 905-2027
ppetersen@axon.com
Secondary: legal@axon.com

Garret G. Rasmussen (*pro hac vice* pending)
Antony P. Kim (*pro hac vice* pending)
Jonathan A. Direnfeld (*pro hac vice* pending)
Thomas Fu (*pro hac vice* pending)
Orrick, Herrington & Sutcliffe LLP
1152 Fifteenth Street N.W.
Washington, D.C. 2005
Telephone: (202) 339-8400
Facsimile: (202) 339-8500
grasmussen@orrick.com
akim@orrick.com
jdirenfeld@orrick.com
tfu@orrick.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*