**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Axon Enterprise Incorporated, | No. CV-20-00014-PHX-DWL |
| Plaintiff, | **ORDER** |
| v. | |
| Federal Trade Commission, et al., | |
| Defendants. | |

## INTRODUCTION

Pending before the Court is Plaintiff Axon Enterprise, Inc.'s ("Axon") motion for preliminary injunction. (Doc. 15.)

Axon sells various technological tools, including body-worn cameras, to police departments. In May 2018, Axon acquired one of its competitors. This acquisition prompted the Federal Trade Commission ("FTC") to conduct an antitrust investigation. In January 2020, just as the FTC was about to initiate a formal administrative proceeding to challenge the acquisition, Axon filed this lawsuit, which seeks to enjoin the administrative proceeding based on three constitutional claims: *first*, that the FTC's structure violates Article II of the Constitution because its commissioners are not subject to at-will removal by the President and its administrative law judges ("ALJs"), who are appointed by its commissioners, are also insulated from at-will removal; *second*, that the FTC's combined role of "prosecutor, judge, and jury" during administrative proceedings violates the Due Process Clause of the Fifth Amendment; and *third*, that the FTC and the Antitrust Division

of the U.S. Department of Justice, which are both responsible for reviewing the antitrust implications of acquisitions but employ different procedures and substantive standards when conducting such review, utilize an arbitrary and irrational "clearance" process when deciding which agency will review a particular acquisition, in violation of the Equal Protection Clause of the Fifth Amendment. (Doc. 15 at 6-15.)[1]

The constitutional claims Axon seeks to raise in this case are significant and topical. Indeed, the Supreme Court recently held oral argument in a case that raises similar issues. *Seila Law LLC v. Consumer Fin. Prot. Bureau*, No. 19-7. This Court, however, is not the appropriate forum to address Axon's claims. It is "fairly discernable" from the FTC Act that Congress intended to preclude district courts from reviewing the type of constitutional claims Axon seeks to raise here—instead, Axon must raise those claims during the administrative process and then renew them, if necessary, when seeking review in the Court of Appeals. Thus, this Court lacks subject matter jurisdiction over this action, Axon's request for a preliminary injunction must be denied, and this action must be dismissed.

**BACKGROUND**

## I.    Factual Background

Axon, which was formerly known as TASER International, Inc., is a Delaware corporation that sells various technological tools, including body-worn cameras and cloud-computing software, to police departments. (Doc. 1 ¶¶ 13, 19-21; Doc. 15-2 ¶ 2.) In May 2018, Axon acquired one of its competitors, Vievu. (Doc. 1 ¶ 24.) The next month, the FTC notified Axon that it was investigating the acquisition. (*Id.* ¶ 25.) Axon cooperated with the investigation over the next 18 months. (*Id.* ¶ 26.) Axon contends that it "spent in excess of $1.6 million responding to the FTC's investigational demands, including attorney and expert fees, ESI production and related hosting and third-party vendor fees and expenses." (Doc. 15-2 at 3 ¶ 5.)

---

[1]    In its reply, Axon clarifies that it "is not challenging the mere fact of concurrent jurisdiction, but rather the arbitrary way in which the agencies determine which of two vastly different (and often outcome-determinative) procedures will be applied to a particular company." (Doc. 21 at 2 n.1.)

Axon contends that, at the conclusion of the investigation, the FTC gave it a choice. First, it could agree to a "blank check" settlement that would rescind its acquisition of Vievu and transfer some of its intellectual property to the newly restored Vievu. (Doc. 1 ¶ 27.) According to Axon, the FTC's "vision" was to turn Vievu into a "clone" of Axon— "something Vievu never was nor could be without impermissible government regulation." (*Id.*) Second, if Axon declined those terms, the FTC would pursue an administrative complaint against Axon. (*Id.*)

II.  Procedural History

On January 3, 2020, Axon filed this lawsuit. (Doc. 1). In its complaint, Axon outlines the factual history discussed above and alleges a violation of its Fifth Amendment rights to due process and equal protection (*id.* ¶¶ 57-60), alleges that the FTC's structure violates Article II of the Constitution (*id.* ¶¶ 61-62), and seeks a declaration that its acquisition of Vievu didn't violate any antitrust laws (*id.* ¶¶ 63-69).

Also on January 3, 2020 (but later that day), the FTC filed an administrative complaint challenging Axon's acquisition of Vievu. (Doc. 15 at 2 n.1.) An evidentiary hearing in the administrative proceeding was originally scheduled for May 19, 2020. (Doc. 22 at 2.) That hearing has now been continued until late June 2020.

On January 9, 2020, Axon filed a motion for a preliminary injunction, seeking to enjoin further FTC proceedings against it. (Doc. 15.)

On January 23, 2020, the FTC filed an opposition to Axon's motion. (Doc. 19.) The FTC relegated the merits of Axon's constitutional claims to a footnote and instead focused on whether the Court possesses subject matter jurisdiction. (Doc. 19 at 1, 14 n.12).

On January 30, 2020, Axon filed a reply. (Doc. 21.) That same day, Axon filed a motion for expedited consideration. (Doc. 22.) Over the FTC's opposition (Doc. 23), the Court granted the motion and scheduled oral argument for April 1, 2020. (Doc. 24.)

On March 10, 2020 the Court issued a tentative order. (Doc. 29.)

On March 27, 2020, the New Civil Liberties Alliance ("NCLA") filed a motion for leave to submit an amicus brief in support of Axon. (Doc. 32.) That motion was granted.

(Doc. 33.)

On April 1, 2020, the Court heard oral argument.  (Doc. 39.)[2]

On April 2, 2020, Axon supplemented the record by filing certain documents generated during the administrative proceeding.  (Doc. 40.)

## ANALYSIS

"Subject-matter limitations on federal jurisdiction serve institutional interests. They keep the federal courts within the bounds the Constitution and Congress have prescribed." *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999).  "[C]ourts have an 'independent obligation' to police their own subject matter jurisdiction."  *Animal Legal Def. Fund v. U.S. Dep't of Agric.*, 935 F.3d 858, 866 (9th Cir. 2019) (citation omitted).  *See also* Fed. R. Civ. Proc. 12(h)(3) ("If the court determines at any time that it lacks subject-matter jurisdiction, the court must dismiss the action.").

In general, district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."  28 U.S.C. § 1331.  This includes the authority to "declare the rights and other legal relations of any interested party seeking such a declaration."  *Id.* § 2201.  "This grant of jurisdiction, however, is not absolute." *Kerr v. Jewell*, 836 F.3d 1048, 1057 (9th Cir. 2016).  Among other things, Congress can "preclude[] district court jurisdiction" over claims pertaining to the conduct of an administrative agency by creating a review framework that evinces a "fairly discernable" intent to require such claims "to proceed exclusively through the statutory review scheme." *Id.* at 1057-58 (citation omitted).  *See also Bennett v. SEC*, 844 F.3d 174, 178 (4th Cir. 2016) ("Congress can . . . impliedly preclude jurisdiction by creating a statutory scheme of administrative adjudication and delayed judicial review in a particular court.").

The issue here is whether Congress, by enacting the FTC Act, intended to require constitutional challenges to the FTC's structure and processes to be brought via the FTC Act's adjudicatory framework.  If so, this Court lacks subject matter jurisdiction to

---

[2]    Due to the COVID-19 pandemic, the Court allowed counsel for the FTC and NCLA to attend the hearing telephonically.  (Docs. 31, 34.)  Additionally, the Court allowed media organizations and members of the public to listen to the hearing telephonically.  (Doc. 37.)

entertain Axon's claims.

I.    Background Law

On three occasions between 1994 and 2012, the Supreme Court addressed whether Congress's enactment of a scheme of administrative adjudication should be interpreted as an implicit decision by Congress to preclude district court jurisdiction. Although none of those decisions involved the FTC Act, they control the analysis here. *Cf. Bennett*, 844 F.3d at 178-81 (identifying these cases as "the trilogy").

The first decision, *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200 (1994), addressed the preclusive effect of the Federal Mine Safety and Health Amendments Act of 1977 ("Mine Act"). Thunder Basin, a coal company, objected to a Mine Act regulation that required it to post the names of certain union representatives. *Id.* at 203-04. Rather than seek review of the regulation through the Mine Act's judicial-review scheme, which contemplates that "[c]hallenges to enforcement [will be] reviewed by the Federal Mine Safety and Health Review Commission . . . and by the appropriate United States court of appeals," Thunder Basin filed a lawsuit in federal district court in which it argued that the Mine Act's review scheme violated its due process rights under the Fifth Amendment. *Id.* at 204-06. The district court issued an injunction in Thunder Basin's favor but the Supreme Court reversed, concluding that the district court lacked subject matter jurisdiction over the action. *Id.* at 205-07.

The Court held that when a statutory scheme, such as the Mine Act, "allocate[s] initial review to an administrative body" and authorizes only "delayed judicial review," courts must analyze three factors—(1) "the statute's language, structure, and purpose," (2) "its legislative history," and (3) "whether the claims can be afforded meaningful review"— when assessing whether Congress's intent to "preclude initial judicial review" can be "fairly," if impliedly, "discerned" from the statutory scheme. *Id.* at 207. The Court then analyzed these factors and concluded that all three supported a finding of preclusion.

First, the Court noted that the Mine Act creates a "detailed structure" for regulated parties to seek review of enforcement activity under the Act—a mine operator is entitled

to challenge an adverse agency order before an ALJ, then seek review of the ALJ's order before the Federal Mine Safety and Health Review Commission, and then, if necessary, seek review of any adverse decision by the Commission in a federal Court of Appeals. *Id.* at 207-08. This structure, the Court concluded, "demonstrates that Congress intended to preclude challenges such as the present one." *Id.* at 208. The Court also noted that the Mine Act contains provisions that enable the Secretary of Labor (who is responsible for enforcing the Mine Act) to file an action in district court when seeking certain types of relief. *Id.* at 209. Because "[m]ine operators enjoy no corresponding right," the Court concluded these provisions served as further proof of Congress's intent to preclude. *Id.*

Second, the Court stated that "[t]he legislative history of the Mine Act confirms this interpretation." *Id.* at 209-11.

Third, the Court addressed whether a finding of preclusion would result, "as a practical matter," in the elimination of Thunder Basin's ability "to obtain meaningful judicial review" of its claims. *Id.* at 213 (quotation omitted). The Court concluded that no such risk was present because Thunder Basin's "statutory and constitutional claims . . . can be meaningfully addressed in the Court of Appeals." *Id.* at 215. In reaching this conclusion, the Court observed that "[t]he Commission has addressed constitutional questions in previous enforcement proceedings" but clarified that, "[e]ven if this were not the case," the availability of eventual review by an appellate court was sufficient. *Id.*

The second component of the trilogy, *Free Enterprise Fund v. Public Co. Accounting Oversight Bd*, 561 U.S. 477 (2010), addressed the preclusive effect of the Sarbanes-Oxley Act of 2002 ("the Sarbanes–Oxley Act") and its interaction with the Securities Exchange Act. Among other things, the Sarbanes–Oxley Act created an entity called the Public Company Accounting Oversight Board ("PCAOB"), which was tasked with providing "tighter regulation of the accounting industry." *Id.* at 484. The PCAOB was composed of five members who were appointed by the Securities and Exchange Commission ("the Commission"). *Id.* The PCAOB's broad regulatory authority included enforcing not only the Commission's rules, but also "its own rules," and it possessed the

authority to "issue severe sanctions in its disciplinary proceedings, up to and including the permanent revocation of a firm's registration, a permanent ban on a person's associating with any registered firm, and money penalties of $15 million." *Id.* at 485.

The plaintiff in *Free Enterprise Fund* was a Nevada accounting firm that been investigated by the PCAOB and then criticized in a report issued by the PCAOB. *Id.* at 487. In a lawsuit filed in federal district court, the accounting firm argued that the PCAOB's structure was unconstitutional because its board members, as well as the Commission members who appointed them, were shielded from Presidential control. *Id.* The district court concluded it had subject matter jurisdiction over the lawsuit but rejected the accounting firm's constitutional claim on the merits. *Id.* at 488. The Supreme Court reversed, agreeing with the district court's jurisdictional analysis but concluding that, on the merits, the PCAOB's structure was unconstitutional.

When addressing the jurisdictional issue, the Court cited *Thunder Basin* as supplying the relevant standards but concluded that, under those standards, jurisdiction was not precluded. *Id.* at 489-91. Central to the Court's analysis was the fact that the relevant adjudicatory framework didn't provide for judicial review over all of the PCAOB's activities. Specifically, the Commission was only empowered "to review any [PCAOB] rule or sanction." *Id.* at 489. Commission action, in turn, could receive judicial review under 15 U.S.C. § 78y. *Id.* This structure was underinclusive, the Court stated, because it "provides only for judicial review of *Commission* action, and not every Board action is encapsulated in a final Commission order or rule." *Id.* Put another way, the Court did "not see how [the accounting firm] could meaningfully pursue [its] constitutional claims" because the conduct it wished to challenge (*e.g.,* the PCAOB's release of the critical report) "is not subject to judicial review." *Id.* at 489-90. Thus, the Court concluded that Congress did not intend to "strip the District Court of jurisdiction over these claims." *Id.* at 491.

The final component of the trilogy, *Elgin v. Dep't of Treasury*, 567 U.S. 1 (2012), addressed the preclusive effect of the Civil Service Reform Act of 1978 ("CSRA"). The CSRA is a "comprehensive system for reviewing personnel action taken against federal

employees." *Id.* at 5 (quotation omitted). Under the CSRA, an employer seeking to terminate (or pursue certain other adverse employment actions against) a covered employee must provide notice, representation, an opportunity to respond, and a reasoned decision. *Id.* at 5-6. An employee who disagrees with the agency's decision may seek review by the Merit Systems Protection Board ("MSPB"). *Id.* at 6. And an employee who disagrees with the MSPB's decision may seek judicial review in the Federal Circuit. *Id.*

In *Elgin*, a male employee was terminated because he hadn't registered with the Selective Service. *Id.* at 6-7. The employee appealed to the MPSB, arguing that the statute requiring men (but not women) to register with the Selective Service is unconstitutional, but the employee didn't seek further review in the Federal Circuit after the MSPB rejected his claim—instead, he (and others) filed a lawsuit in federal district court raising the same constitutional challenge and requesting various forms of equitable relief, including reinstatement. *Id.* The district court concluded it had jurisdiction to resolve the constitutional claim but the Supreme Court reversed, holding that "the CSRA precludes district court jurisdiction over petitioners' claims even though they are constitutional claims for equitable relief." *Id.* at 8.

The Court began by reaffirming that, under *Thunder Basin*, "the appropriate inquiry" when evaluating whether Congress intended to preclude district court jurisdiction "is whether it is 'fairly discernible' from the [statute] that Congress intended [litigants] to proceed exclusively through the statutory review scheme, even in cases in which the [litigants] raise constitutional challenges to federal statutes." *Id.* at 8-10. Next, the Court "examined the CSRA's text, structure, and purpose." *Id.* at 10-11. After discussing the various forms of review available under the statute, the Court concluded that "[g]iven the painstaking detail with which the CSRA sets out the method for covered employees to obtain review of adverse employment actions, it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." *Id.* at 11-12. The Court also noted that the CSRA expressly allows employees to assert one particular type of claim in federal district court. *Id.* at 13 (citing 5 U.S.C. § 7702(b)(2)). The existence of

this provision, the Court stated, "demonstrates that Congress knew how to provide alternative forums for judicial review based on the nature of an employee's claim. That Congress declined to include an exemption . . . for challenges to a statute's constitutionality indicates that Congress intended no such exception." *Id.*

The Court also addressed whether a preclusion finding would effectively "foreclose all meaningful judicial review" of the plaintiffs' constitutional claim. *Id.* at 15-21 (citing *Free Enterprise Fund*, 561 U.S. at 489). The Court concluded that such a risk was not present, even though "the MSPB has repeatedly refused to pass upon the constitutionality of legislation," because the Federal Circuit, "an Article III court fully competent to adjudicate [constitutional] claims," could address those constitutional claims during the final stage of the statutory review process. *Id.* at 16-18. The Court also rejected the notion that the Federal Circuit would be hamstrung by an inadequately developed record when conducting this review, explaining that "[e]ven without factfinding capabilities, the Federal Circuit may take judicial notice of facts relevant to the constitutional question" and noting that "we see nothing extraordinary in a statutory scheme that vests reviewable factfinding authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question to which the facts pertain." *Id.* at 19-21.

## II.    Whether It Is "Fairly Discernable" From The FTC Act That Congress Intended To Preclude District Court Jurisdiction Over Axon's Constitutional Challenges

With this backdrop in mind, the Court will turn to the FTC Act. Nothing in the FTC Act expressly divests district courts of jurisdiction to entertain constitutional claims of the sort raised by Axon in this action, but *Thunder Basin*, *Free Enterprise Fund*, and *Elgin* all recognize that Congress may implicitly preclude such jurisdiction through the enactment of an administrative review scheme. The question here is whether such intent is "fairly discernable" from the FTC Act. *Thunder Basin*, 510 U.S. at 207 (citation omitted).

### A.    Text, Structure, And Purpose Of The FTC Act

Under *Thunder Basin* and its progeny, the first factor to consider when assessing "[w]hether a statute is intended to preclude initial judicial review" is "the statute's

language, structure, and purpose." *Thunder Basin*, 510 U.S. at 207. This factor strongly supports a finding of preclusion in this case.

The text and structure of the FTC Act closely resemble those of the Mine Act, which was the statutory scheme at issue in *Thunder Basin*. The FTC Act sets out a detailed scheme for preventing the use of unfair methods of competition. 15 U.S.C. § 45(a)-(b). Additionally, the FTC Act's enforcement provisions create timelines and mechanisms for adjudicating alleged violations that are similar to those outlined in the Mine Act. *Compare* 15 U.S.C. § 45(b) *with* 30 U.S.C. § 815. Finally, and most important, the FTC Act's judicial review process is similar to the Mine Act's, up to and including conferring "exclusive jurisdiction" upon the relevant Court of Appeals to affirm, modify, or set aside final agency orders. *Compare* 15 U.S.C. § 45(c)-(d) *with* 30 U.S.C. § 816(a). In *Thunder Basin*, the Supreme Court held that this type of "detailed structure" suggested "that Congress intended to preclude challenges such as the present one." 510 U.S. at 208. Similarly, in *Elgin*, the Supreme Court held when a statutory scheme sets out in "painstaking detail" the process for aggrieved parties to obtain review of adverse decisions, "it is fairly discernible that Congress intended to deny such employees an additional avenue of review in district court." 567 U.S. at 11-12. The FTC Act has a "detailed structure" that includes "painstaking detail" concerning how to seek review, so the same inference arises here. *Cf. Hill v. SEC*, 825 F.3d 1236, 1242 (11th Cir. 2016) (concluding that a review scheme "materially indistinguishable" from that in *Thunder Basin* demonstrated congressional intent to preclude district court jurisdiction).[3]

The FTC Act also contains a provision authorizing the FTC (but not regulated parties) to file a lawsuit in federal district court. *See* 15 U.S.C. § 53(a) (authorizing the FTC to "bring suit in a district court of the United States" when certain conditions are satisfied). In *Thunder Basin*, the Supreme Court stated that an inference of preclusive

---

[3] In its reply, Axon points out several ways in which the text, structure, and purpose of the FTC Act arguably differ from the text, structure, and purpose of the CSRA. (Doc. 21 at 4-5.) However, Axon does not attempt to make such a showing with respect to the Mine Act.

effect arose because the Mine Act allowed the Secretary of Labor to file certain claims in district court but "[m]ine operators enjoy no corresponding right." 510 U.S. at 209. *See also Elgin*, 567 U.S. at 13 (provision allowing employees to file claims in district court showed that "Congress knew how to provide alternative forums for judicial review based on the nature of an employee's claim. That Congress declined to include an exemption . . . for challenges to a statute's constitutionality indicates that Congress intended no such exception."). So, too, here.

Finally, the purpose of the FTC Act suggests that Congress intended to preclude district court jurisdiction. Congress intended the FTC to act as a successor to the Interstate Commerce Commission and enforce "its broad mandate to police unfair business conduct." *FTC v. AT&T Mobility LLC*, 883 F.3d 848, 854 (9th Cir. 2018). To that end, "Congress deliberately gave the FTC broad enforcement powers." *Id.* This is similar to the Mine Act's purpose of "strengthen[ing] and streamlin[ing] health and safety enforcement requirements," *Thunder Basin*, 510 U.S. 221, as well as the CSRA's purpose of introducing an "integrated scheme of administrative and judicial review" to "replace an outdated patchwork of statutes and rules," *Elgin*, 567 U.S. at 13-14 (citation omitted). In other words, where Congress acts to introduce a statutory scheme that brings order from chaos, it indicates that Congress intended to preclude district court jurisdiction. The FTC Act was such an attempt.[4]

...

...

---

[4] This conclusion is bolstered by the slate of recent cases concluding that the SEC's authorizing legislation precludes district court jurisdiction over constitutional challenges to the SEC's structure. *See, e.g., Bennett*, 844 F.3d at 181-82; *Hill*, 825 F.3d at 1242-1245; *Tilton v. SEC*, 824 F.3d 276, 282-81 (2d Cir. 2016); *Jarkesy v. SEC*, 803 F.3d 9, 16-17 (D.C. Cir. 2015); *Bebo v. SEC*, 799 U.S. 765 (7th Cir. 2015). Although those decisions are not binding here, their logic is persuasive. The review provisions of the FTC Act are "materially indistinguishable," *Hill*, 825 F.3d at 1242, and "nearly identical," *Jarkesy*, 803 F.3d at 16, to those contained in 15 U.S.C. § 78y, which itself resembles the review provisions in the Mine Act. Thus, the Court is not persuaded by the NCLA's colorful argument that *Bennett, Hill, Tilton, Jarkesy,* and *Bebo* were all wrongly decided and this Court should not "follow the herd of courts off the cliff in disregarding the jurisdictional significance of *Free Enterprise*." (Doc. 32-2 at 21.)

B.     **Legislative History Of The FTC Act**

*Thunder Basin* suggests the second relevant preclusion factor is the underlying statute's legislative history.  510 U.S. at 207.  However, Justice Scalia, joined by Justice Thomas, issued a concurring opinion in *Thunder Basin* objecting to the consideration of legislative history as part of the preclusion analysis, stating that such consideration only "serve[d] to maintain the illusion that legislative history is an important factor in this Court's deciding of cases, as opposed to an omnipresent makeweight for decisions arrived at on other grounds." *Id.* at 219 (Scalia, J., concurring).

The Supreme Court's subsequent decisions in this area, *Free Enterprise Fund* and *Elgin*, did not address (much less focus on) legislative history, and the Supreme Court has issued subsequent opinions in other contexts that reject the use of legislative history as a legitimate interpretative tool.  *See, e.g., Epic Sys. Corp. v. Lewis*, 138 S.Ct. 1612, 1631 (2018) ("[L]egislative history is not the law.  It is the business of Congress to sum up its own debates in its legislation, and once it enacts a statute [w]e do not inquire what the legislature meant; we ask only what the statute means.") (citations and internal quotation marks omitted).  Thus, it is unclear whether this portion of *Thunder Basin* retains validity.  Indeed, the FTC does not mention legislative history in its response brief (Doc. 19) and Axon barely mentions it its reply (Doc. 21 at 4 [criticizing the FTC for failing to "point to legislative history for the FTC Act that is similar to the CSRA's"]).

In any event, to the extent legislative history remains a relevant consideration, and to the extent it is possible to draw any meaningful conclusions from the FTC Act's legislative history (which the Court doubts), it tends to support the inference that Congress sought to preclude district court jurisdiction over the type of claims presented here.  Judicial review of final, and only final, FTC actions was a component of the FTC Act from its earliest iterations.  *See* Marc Winerman, *The Origins of the FTC: Concentration, Cooperation, Control, and Competition*, 71 Antitrust L. J. 1, 4 (2003).  The debate focused on the breadth of judicial review and settled on the standard contained in § 45 to this day: deference to the FTC's findings of fact, but otherwise silent.  *Id.* at 5, 76-77, 80 (discussing

the FTC Act's proponents' "essential faith in the workings of a commission"), 90-92. It does not appear Congress ever considered amending the FTC Act to route complaints through any process other than administrative proceedings. *Id.*

C. **Availability Of Meaningful Review And Associated Considerations**

In *Thunder Basin*, the Supreme Court identified the third preclusion factor as "whether the claims can be afforded meaningful review" and then addressed—in the portion of the opinion concerning this factor—whether the claims were "wholly collateral" to the statute's review provisions and whether the claims fell outside the agency's expertise. 510 U.S. at 207, 212-15. However, in both *Elgin* and *Free Enterprise Fund*, the Supreme Court seemed to frame the third factor as a conjunctive, three-part test involving consideration of (1) whether a finding of preclusion would foreclose all meaningful judicial review; (2) whether the suit is "wholly collateral" to a statute's review provisions; and (3) whether the claims are "outside the agency's expertise." *Elgin*, 567 U.S. at 15-16; *Free Enterprise Fund*, 561 U.S. at 489-90. It is therefore unclear whether these are distinct factors or simply different ways of addressing the same thing.

Although the Ninth Circuit has not resolved this issue, other appellate courts have recognized its "unsettled" nature and concluded that "the most critical thread in the case law is . . . whether the plaintiff will be able to receive meaningful judicial review without access to the district courts." *Bebo,* 799 F.3d at 774. *See also Hill*, 825 F.3d at 1245 ("We agree with the Second and Seventh Circuits that the first factor—meaningful judicial review—is 'the most critical thread in the case law.'") (citation omitted). The Court agrees and will follow the same approach here.

1. Availability Of Meaningful Review

Axon's overarching argument is that this case "is materially indistinguishable" from *Free Enterprise Fund* and that "the FTC Act affords no meaningful review of Axon's claims outside this lawsuit." (Doc. 21 at 2-5.) This argument is unavailing.

As noted, *Free Enterprise Fund* focused on the fact that the PCAOB could engage in some forms of regulatory activity, including the issuance of reports, that were effectively

immune from judicial review due to a mismatch in the administrative review scheme—the SEC could only review a "rule or sanction" promulgated by the PCAOB, "and not every Board action is encapsulated in a final Commission order or rule." 561 U.S. at 489.

This sort of mismatch is not present under the FTC Act, at least with respect to the constitutional claims Axon seeks to raise here.[5] Fundamentally, Axon believes the FTC shouldn't be allowed to investigate or challenge its acquisition of Vievu. Yet these are claims that Axon can present during the pending administrative proceeding—indeed, Axon has now presented them[6]—and then renew, if necessary, when seeking review of the FTC's final cease-and-desist order in a federal appellate court. Critically, Axon acknowledges that it "could, in theory, raise its constitutional claims on appeal from an adverse Commission order" and merely argues that the availability of such review "is irrelevant" because "the Commission rules do not allow Axon to depose the DOJ officials who participated in the clearance process without first getting the permission of the FTC-appointed ALJ" and "there will be no guarantee of an administrative record that will allow a reviewing court to decide those claims." (Doc. 21 at 7-8.) But these are essentially the same arguments the Supreme Court rejected in *Thunder Basin* and *Elgin*, which hold that the eventual availability of review in a federal appellate court—even if preceded by litigation before administrative bodies that refused to consider or develop the constitutional claims—is sufficient. *Thunder Basin*, 510 U.S. at 213-15 (finding of preclusion warranted because Thunder Basin's "statutory and constitutional claims . . . can be meaningfully addressed in the Court of Appeals," "[e]ven if" the agency has a track record of refusing to consider such claims during the administrative proceeding); *Elgin*, 567 U.S. at 16-21 (no risk that finding of preclusion would foreclose meaningful review, even though "the MSPB

---

[5]      During oral argument, Axon emphasized that the Court must conduct an independent preclusion analysis as to each of its three constitutional claims. The Court has done so and concludes, for the reasons discussed below, that Axon may obtain meaningful review of each claim through the FTC's administrative framework, that none of the three claims is wholly collateral to the FTC Act's review provisions, and that the FTC's agency expertise could be brought to bear on each claim.

[6]      S*ee* FTC Doc. No. D9389, Answer and Defenses of Respondent Axon Enter. Inc., Affirmative Defenses 14-18. This document is available here.

- 14 -

has repeatedly refused to pass upon the constitutionality of legislation," because the Federal Circuit, "an Article III court fully competent to adjudicate [constitutional] claims," could address those claims during the final stage of the statutory review process or remand to the MSPB with instructions to receive the necessary evidence).

Similarly, here, if the FTC issues an adverse decision and Axon seeks further review, the Ninth Circuit can take judicial notice of facts that bear upon Axon's constitutional claims. *Singh v. Ashcroft*, 393 F.3d 903, 905 (9th Cir. 2004) (holding that, even though a statute limited the Ninth Circuit to reviewing the administrative record, "it is nonsense to suppose that we are so cabined and confined that we cannot exercise the ordinary power of any court to take notice of facts that are beyond dispute"). And if the facts needed by the Ninth Circuit are beyond judicial notice, the FTC Act specifically provides that "the court may order such additional evidence to be taken before the [FTC] and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper." 15 U.S.C. § 45(c). In other words, "there is nothing extraordinary in a statutory scheme that vests reviewable authority in a non-Article III entity that has jurisdiction over an action but cannot finally decide the legal question to which the facts pertain." *Elgin*, 567 U.S. at 19. *See also Bank of La. v. FDIC*, 919 F.3d 916, 925-928 (5th Cir. 2019) (rejecting claim that statute did not provide for meaningful judicial review because the administrative proceedings only allowed "limited discovery").

Axon attempts to escape this conclusion by narrowly focusing on particular aspects of the FTC's conduct and arguing that those aspects are effectively immune from judicial review. For example, Axon argues that "the clearance decision, which put the FTC, rather than the DOJ, in charge of the Axon/Vievu merger," was an effectively unreviewable decision that "caused real harm before any administrative action was filed." (Doc. 21 at 6.) Axon also contends in a footnote that the mere fact of "being regulated" by the FTC is a cognizable injury. (*Id.* at 6 n.4.)

The problem with these arguments is that they are divorced from the facts of this case. Even assuming *arguendo* that a company that was investigated by the FTC for

acquiring a competitor, spent money complying with the FTC's investigative demands, and ultimately persuaded the FTC not to oppose the acquisition might lack an effective mechanism for challenging the constitutionality of the FTC's investigatory effort (because there would be no administrative proceeding in which to raise those claims), Axon stands in different shoes here. It didn't file this lawsuit in mid-2018, upon the FTC's initiation of the investigation. Instead, it filed suit 18 months later, mere hours before the FTC initiated an administrative proceeding against it (which Axon was apparently racing to the courthouse to beat). Thus, unlike the accounting firm in *Free Enterprise Fund*, which had its reputation impugned by a critical report issued by the PCAOB but could not challenge that report in any subsequent administrative proceeding, here Axon can raise (and has raised) all of its constitutional challenges, including its challenge to the clearance process, during the FTC administrative proceeding[7] and may renew those challenges when seeking review by a federal appellate court. *See* 15 U.S.C. § 45(c)-(d) (an entity dissatisfied with an FTC cease-and-desist order may seek review in the court of appeals "within any circuit where the method of competition or the act or practice in question was used or where such person, partnership, or corporation resides or carries on business," and the appellate court thereafter has exclusive jurisdiction to "affirm, enforce, modify, or set aside orders of the Commission").

Axon also contends that the absence of effective judicial review is demonstrated by the fact that it (like the accounting firm in *Free Enterprise Fund*) filed this lawsuit before the initiation of administrative proceedings. (Doc. 21 at 3 & n.3.) This argument overlooks that the plaintiff in *Thunder Basin* also filed a pre-enforcement challenge, yet the Supreme

---

[7] Following oral argument, Axon filed documents showing that the attorneys representing the FTC in the administrative proceeding have refused to comply with Axon's requests for discovery pertaining to the FTC/DOJ clearance process. (Doc. 40.) These documents do not alter the "meaningful review" analysis for two reasons. First, the documents only reflect the existence of a discovery dispute between counsel that has not yet been brought to the ALJ's attention. The ALJ could, at least theoretically, side with Axon and order the FTC's counsel to produce the requested discovery materials. Second, even if Axon is barred from seeking clearance-related discovery during the administrative proceeding, *Thunder Basin* and *Elgin* hold that the appellate courts' eventual ability to consider constitutional claims during the final stage of the review process and, if necessary, remand for additional fact-finding means that "meaningful review" remains available.

Court still concluded that conferring jurisdiction upon the district court would "be inimical to the structure and purpose" of the comprehensive statutory review scheme. *Thunder Basin*, 510 U.S. at 781. *Free Enterprise Fund* did not overrule *Thunder Basin* on this point. 561 U.S. at 490-91. *See also Hill*, 825 F.3d at 1249 ("[I]t makes no difference that the Gray respondents filed their complaint in the face of an impending, rather than extant, enforcement action. The critical fact is that the Gray respondents can seek full postdeprivation relief under § 78y."); *Great Plains Coop v. Commodity Futures Trading Comm'n*, 205 F.3d 353, 355 (8th Cir. 2000) ("Great Plains's complaint is an impermissible attempt to make an 'end run' around the statutory scheme. Allowing the target of an administrative complaint simply to file for an injunction in a federal district court would . . . allow the plaintiff to short-circuit the administrative review process and the development of a detailed factual record by the agency.").

Finally, the NCLA identifies three cases—(1) *Lucia v. SEC*, 138 S. Ct. 2044 (2018), (2) *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991), and (3) *Veterans for Common Sense v. Shinseki*, 678 F.3d 1013 (9th Cir. 2012)—as purportedly showing that district courts possess jurisdiction to resolve the sort of constitutional challenges Axon seeks to raise here (Doc. 32-2).[8] All three decisions are easily distinguishable.

In *Lucia*, the petitioner had been charged with securities law violations by the SEC. 138 S.Ct. at 2049-50. During the ensuing administrative proceeding, Lucia sought to raise a constitutional challenge—he argued the SEC ALJ presiding over his case hadn't been appointed in the manner required by the Appointments Clause of Article II of the Constitution. *Id.* This challenge went nowhere during the administrative proceeding (which resulted in the imposition of a $300,000 fine and a lifetime ban from the securities industry), but Lucia renewed it when seeking review by the D.C. Circuit (which also rejected it) and again when seeking review in the Supreme Court. *Id.* at 2050-51. The Supreme Court agreed with Lucia on the merits of his Appointments Clause claim, *id.* at

---

[8] Axon did not cite *Lucia* or *Shinseki* in its motion or reply but did include one citation to *McNary*. (Doc. 15 at 11.)

2051-55, and then stated that "[t]he only issue left is remedial." *Id.* at 2055. Because Lucia had raised a "timely challenge" by "contest[ing] the validity of [the ALJ's] appointment before the Commission, and continued pressing that claim in the Court of Appeals and [the Supreme Court]," the Court concluded he was entitled to a new hearing before a different, properly-appointed ALJ. *Id.* at 2055-56.

It is curious that the NCLA views *Lucia* as supporting Axon's jurisdictional claims. Unlike Axon, the petitioner in *Lucia* didn't file a preemptive lawsuit in federal court when he learned the SEC would be pursuing an administrative proceeding against him. Instead, he raised his constitutional claims during the administrative proceeding and then renewed them when seeking review of the agency's final decision in an appellate court. Indeed, the Supreme Court identified his conscientious compliance with the requirements of the administrative-review scheme as a reason why he was entitled to relief. Although Lucia and his counsel may, understandably, view the relief that was ultimately granted in *Lucia* as less-than-meaningful in practice,[9] the *Lucia* decision itself—to the extent it says anything about implicit preclusion—tends to reaffirm the Supreme Court's holdings in *Thunder Basin* and *Elgin* that eventual review in an appellate court is meaningful review.

Next, in *McNary*, a group of undocumented aliens filed an action in district court asserting that the Immigration and Naturalization Service had committed a pattern and practice of constitutional violations when administering a particular immigration benefit program. 498 U.S. at 483-84. The question presented in *McNary* was whether section 210(e) of the Immigration and Nationality Act ("INA"), "which bars judicial review of individual determinations except in deportation proceedings, also forecloses this general challenge to the INS'[s] unconstitutional practices." *Id.* at 491. The Supreme Court concluded the district court possessed jurisdiction over the pattern-and-practice lawsuit

---

[9] The NCLA, which "now represents Ray Lucia," argues that his "odyssey belies blithe statements that eventual, possible appellate review is 'meaningful review' for [a claim alleging] a defect in the tribunal itself." (Doc. 32-2 at 14.) Likewise, Axon's counsel stressed during oral argument that a years-long administrative and appellate process that might result in a redo of the entire process couldn't possibly amount to meaningful review. Although the Court doesn't discount these sentiments, they find no support in *Lucia*, *Elgin*, and *Thunder Basin*, which the Court must follow.

because: (1) the plain language of section 210(e) only barred jurisdiction over lawsuits challenging "the denial of an individual application" and thus did not, by implication, encompass "general collateral challenges to unconstitutional practices and policies used by the agency in processing applications" (*id.* at 491-92): (2) the statute also contained a provision requiring appellate courts to limit their review to the administrative record, yet the type of administrative record created in an individual case[10] would be meaningless in a pattern-and-practice case (*id.* at 492-94); and (3) Congress could have mirrored "more expansive" language from other statutes, so its choice to use narrower language in section 210(e) was suggestive of an intent to allow the plaintiffs' claim to proceed (*id.* at 494). Additionally, the Court noted:

> [B]ecause there is no provision for direct judicial review of the denial [of the requested benefit] . . . unless the alien is later apprehended and deportation proceedings are initiated, most aliens denied [the requested benefit] can ensure themselves review in courts of appeals only if they voluntarily surrender themselves for deportation. Quite obviously, that price is tantamount to a complete denial of judicial review for most undocumented aliens.

*Id.* at 496-97.

There are at least four reasons why this case is different from, and not controlled by, *McNary*. First, because *McNary* addressed whether an affirmative jurisdiction-stripping statute encompassed a certain type of claim, the Court performed a textual analysis that turned on the wording of the statutory provision in question.[11] Here, the question isn't whether Axon's claims fall within some provision of the FTC Act that attempts to strip district courts of jurisdiction over certain categories of claims. Instead, the question is whether the existence of the regulatory scheme itself evinces an implicit judgment by

---

[10] Specifically, that record would "consist[] solely of a completed application form, a report of medical examination, any documents or affidavits that evidence an applicant's agricultural employment and residence, and notes, if any, from [a Legalization Office] interview." *Id.* at 493.

[11] The provision at issue in *McNary*, codified at 8 U.S.C. § 1160(e)(1), provides: "There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection."

- 19 -

Congress that district court jurisdiction should be precluded. Second, and in a related vein, *McNary* was decided before *Thunder Basin*, *Free Enterprise Fund*, and *Elgin*, which are the key cases addressing the topic of implicit preclusion. To the extent there is any conflict between *McNary* and the trilogy, the later-decided cases control. Third, the appellate-review provisions of section 210(e) of the INA and the FTC Act are materially different—the former requires appellate courts to limit their review to the administrative record while the latter specifically allows appellate courts to remand for additional fact-finding.[12] *Cf. Elgin*, 567 U.S. at 21 n.11 (distinguishing *McNary* because it involved "a statutory review scheme that provided no opportunity for the plaintiffs to develop a factual record relevant to their constitutional claims before the administrative body and then restricted judicial review to the administrative record created in the first instance," whereas "the CSRA review process is not similarly limited"). Fourth, and finally, an adverse jurisdictional ruling in *McNary* would have required the plaintiffs to voluntarily surrender for deportation in order to pursue their claims. Axon, in contrast, does not have to "bet the farm" to obtain review—it can raise its constitutional claims during the existing administrative proceeding. *See, e.g., Jarkesy*, 803 F.3d at 20-21 (distinguishing *McNary* on this ground); *Bebo*, 799 F.3d at 775 n.3 (same).

Last, in *Shinseki*, the plaintiffs brought a class action against the Department of Veterans Affairs ("VA"), arguing that "the VA's handing of mental health care and service-related disability claims deprives [the plaintiffs] of property in violation of the Due Process Clause of the Constitution and violates the VA's statutory duty to provide timely medical care and disability benefits." 678 F.3d at 1017. The Ninth Circuit addressed whether "the

---

[12] *Compare* 8 U.S.C. § 1160(e)(3)(B) ("Such judicial review shall be based solely upon the administrative record established at the time of the review by the appellate authority and the findings of fact and determinations contained in such record shall be conclusive unless the applicant can establish abuse of discretion or that the findings are directly contrary to clear and convincing facts contained in the record considered as a whole.") *with* 15 U.S.C. § 45(c) ("If either party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for the failure to adduce such evidence in the proceeding before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper.").

Veterans' Judicial Review Act ['VJRA'] . . . deprives us of jurisdiction over these claims."
*Id.* at 1019. The court explained:

> [T]he VJRA supplies two independent means by which we are disqualified from hearing veterans' suits concerning their benefits. First, Congress has expressly disqualified us from hearing cases related to VA benefits in [38 U.S.C.] § 511(a) . . . and second, Congress has conferred exclusive jurisdiction over such claims to the Veterans Court and the Federal Circuit.

*Id.* at 1022-23. With this backdrop in mind, the court concluded the district court lacked jurisdiction over the plaintiffs' first two claims, which related to mental health care (*id.* at 1026-28) and disability benefit claims (*id.* at 1028-32). However, with respect to the plaintiffs' final claim—a constitutional challenge to the procedures employed by VA regional offices—the court concluded it fell outside the VJRA's jurisdiction-stripping provision because (1) as a textual matter, section 511(a) only precludes judicial review of "'decisions' affecting the provision of benefits to any individual claimants," yet the plaintiffs "do[] not challenge decisions at all. A consideration of the constitutionality of the procedures in place, which frame the system by which a veteran presents his claims to the VA, is different than a consideration of the decisions that emanate through the course of the presentation of those claims"; and (2) "the VJRA does not provide a mechanism by which the organizational plaintiffs here might challenge the absence of system-wide procedures, which they contend are necessary to afford due process. . . . Because [the plaintiffs] would be unable to assert [their] claim in the review scheme established by the VJRA, that scheme does not operate to divest us of jurisdiction." *Id.* at 1033-35 (internal citation omitted).

*Shinseki* is distinguishable for many of the same reasons as *McNary*. It addressed whether an affirmative jurisdiction-stripping statute should, as a textual matter, be construed to encompass a particular type of claim and emphasized that an adverse ruling would effectively preclude the plaintiffs from ever raising their claim. Here, the question is whether the FTC Act evinces an implied intent to preclude district court jurisdiction and an adverse ruling wouldn't preclude Axon from raising its claims—it has already done so in the pending administrative proceeding and can renew them, if necessary, when seeking

review in an appellate court.

## 2. Wholly Collateral

The next consideration is whether the claim is "wholly collateral" to the statute's review provisions. Unfortunately, "the reference point for determining whether a claim is 'wholly collateral' is not free from ambiguity." *Bennett*, 844 F.3d at 186. "Neither *Elgin* nor *Free Enterprise Fund* clearly defines the meaning of 'wholly collateral.'" *Bebo*, 799 F.3d at 773.

Since *Elgin*, courts seeking to assess whether a claim is "wholly collateral" have taken two approaches. *Bebo,* 799 F.3d at 773-74. First, some courts have looked to "the relationship between the merits of the constitutional claim and the factual allegations against the plaintiff." *Id.* at 773. These courts have taken their cue from *Free Enterprise Fund*, which concluded that the accounting firm's claims were "wholly collateral" because they were unrelated to "any . . . orders or rules from which review might be sought." 561 U.S. at 489-491. As a result, these courts have concluded that a claim is wholly collateral if the basis for the claim would exist regardless of the merits decision of the agency. *Hill v. SEC*, 114 F. Supp. 3d 1297, 1309 (N.D. Ga. 2015) ("What occurs at the administrative proceeding and the SEC's conduct there is irrelevant to this proceeding which seeks to invalidate the entire statutory scheme."); *Duka v. SEC*, 103 F. Supp. 3d 382, 391 (S.D.N.Y. 2015) ("Similarly, [plaintiff] contends that her Administrative Proceeding may not constitutionally take place, and she does not attack any order that may be issued in her administrative proceeding relating to the outcome of the SEC action.") (internal quotations omitted); *Gupta v. SEC*, 796 F. Supp. 2d 503, 513 (S.D.N.Y. 2011) ("These allegations . . . would state a claim even if Gupta were entirely guilty of the charges made against him in the OIP."). Notably, these courts have either been directly overruled or had their holdings called into serious doubt. *Hill*, 825 F.3d at 1252; *Tilton*, 824 F.3d at 291.

Second, other courts have looked to *Elgin* when evaluating the meaning of "wholly collateral." *Bebo*, 799 F.3d at 774. These courts seize on *Elgin*'s conclusion that the claims in that case were not wholly collateral because they were "the vehicle by which [plaintiffs]

seek to reverse the removal decision, to return to federal employment, and to receive compensation." 567 U.S. at 22. The Courts of Appeals that have chosen between these two approaches have unanimously favored the second approach. *Bennett*, 844 F.3d at 187 ("However, we think the second reading is more faithful to the more recent Supreme Court precedent . . . ."); *Tilton*, 824 F.3d at 288 ("The appellants' Appointments Clause claim arose directly from that enforcement action and serves as an affirmative defense within the proceeding."); *Jarkesy*, 803 F.3d at 23 ("Here, [plaintiff's] constitutional and APA claims do not arise 'outside' the SEC administrative enforcement scheme—they arise from actions the Commission took in the course of that scheme. And they are the 'vehicle by which' Jarkesy seeks to prevail in his administrative proceeding.") (quoting *Elgin*, 567 U.S. at 22).

These approaches can be viewed as two sides of the same inquiry. *Free Enterprise Fund*'s "wholly collateral" finding turned on the fact that the accounting firm's claims were "collateral to any . . . orders or rules from which review might be sought." 561 U.S. at 490. In other words, the fact the accounting firm was seeking to challenge agency action beyond the scope of what was reviewable under the statutory scheme is what rendered its claims collateral. *Id.* *Elgin* focused on whether the claims at issue were "the vehicle by which [plaintiffs] seek to reverse" adverse action. 567 U.S. at 22. That is, both cases looked to whether there was a way for the plaintiff to challenge the agency conduct at issue. No such vehicle existed in *Free Enterprise Fund*—the claims which the accounting firm sought to bring had no path to judicial review. In contrast, the *Elgin* plaintiffs did have a path to judicial review and they could have raised their constitutional claims in the course of that path.

The best way to harmonize *Free Enterprise Fund* and *Elgin* is to conclude that the "wholly collateral" consideration turns on whether a vehicle exists (or could exist) for the plaintiff ultimately to receive judicial review of its constitutional claim. If no vehicle exists, the claim is "wholly collateral" to the review scheme, and this consideration would weigh in favor of a district court exercising jurisdiction. This does "reduce[] the factor's independent significance," but it is "more faithful to the more recent Supreme Court

precedent" and harmonizes seemingly discordant case law. *Bennett*, 844 F.3d at 187. *See also Tilton*, 824 F.3d at 288; *Jarkesy*, 803 F.3d at 27 ("[T]he possibility that [an agency] order in [plaintiff's] favor might moot some or all of his challenges does not make those challenges 'collateral' and thus appropriate for review outside the administrative scheme. . . . [T]hat possibility [is] a *feature* . . . not a bug.") (quotation omitted).

Given this backdrop, there is no merit to Axon's argument that its constitutional claims are "wholly collateral" to the issues to be adjudicated during the administrative proceeding because its "claims (just like those in *Free Enterprise Fund*) go to the agency's constitutional authority" and "do not 'arise[] out of' an enforcement proceeding." (Doc. 21 at 9-10.) Because Axon can assert (and already has asserted) its constitutional claims during the administrative proceeding, and because Axon retains the ability to seek further review of those claims in a federal appellate court, those claims are not "wholly collateral" to the FTC Act's review provisions. This logic also disposes of Axon's contention, raised during oral argument, that its constitutional challenge to the clearance process is "wholly collateral" because the clearance process isn't even enshrined in the FTC Act—Axon's ability to raise this challenge as part of the enforcement proceeding shows it isn't "wholly collateral" under *Elgin*.

Finally, one additional clarification is necessary with respect to the concept of "wholly collateral" claims. Axon's briefing can be interpreted as suggesting its claims are wholly collateral because they are constitutional in nature. (Doc. 21 at 8-9.) But in *Elgin*, the Supreme Court expressly rejected "a jurisdictional rule based on the nature of an employee's constitutional claim." 567 U.S. at 15. Creating such a rule would "deprive the aggrieved employee, the [agency], and the district court of clear guidance about the proper forum for the employee's claims at the outset of the case" because the line between constitutional challenges to statutes and other types of constitutional challenges was "hazy at best." *Id.* Likewise, *Elgin* rejected a rule that would have reserved "facial constitutional challenges to statutes" for district courts. *Id.* At bottom, "exclusivity does not turn on the constitutional nature of" a claim. *Id. Thunder Basin* reached a similar conclusion, holding

that because a due process challenge "can be meaningfully addressed in the Court of Appeals," the mere fact the plaintiff had asserted a constitutional challenge was insufficient to establish district court jurisdiction. 510 U.S. at 215.

*Thunder Basin* and *Elgin*, in short, foreclose the possibility that the Court has jurisdiction over Axon's due process and equal protection claims simply because they are constitutional in nature—*Thunder Basin* precluded jurisdiction over a due process claim, 510 U.S. at 215, and *Elgin* precluded jurisdiction over an equal protection claim, 567 U.S. at 7, 16. *See also Bebo*, 799 F.3d at 768 (district court lacked jurisdiction even though plaintiff sought to challenge a statute as "facially unconstitutional under the Fifth Amendment because it provides the SEC 'unguided' authority to choose which respondents will and which will not receive the procedural protections of a federal district court, in violation of equal protection and due process guarantees").

The potential wrinkle is that Axon is also asserting an Article II claim, which was not raised in *Thunder Basin* or *Elgin* but was the claim at issue in *Free Enterprise Fund.* Despite that wrinkle, the logic of *Elgin* extends to preclude jurisdiction over that claim here. *Elgin* was concerned with a lack of clarity when it came to deciding whether jurisdiction was precluded and rejected "hazy" line drawing. 567 U.S. at 15. For example:

> [P]etitioners contend that facial and as-applied constitutional challenges to statutes may be brought in district court, while other constitutional challenges must be heard by the [agency]. But, as we explain below, that line is hazy at best and incoherent at worst. The dissent's approach fares no better. The dissent carves out for district court adjudication only facial constitutional challenges to statutes, but we have previously stated that "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.

*Id.* (citation omitted). Axon's Article II claim, at bottom, attacks the for-cause removal protection for FTC commissioners (15 U.S.C. § 41) and ALJs (5 U.S.C. § 7521). (Doc. 15 at 12-14.) In other words, Axon brings a facial constitutional challenge to a statute. *Elgin* makes clear that the facial nature of the claim is not, alone, enough to establish district court jurisdiction. The weight of authority from outside the Ninth Circuit supports this

conclusion. *Hill*, 825 F.3d at 1246 ("Whether an injury has constitutional dimensions is not the linchpin in determining its capacity for meaningful judicial review."); *Jarkesy*, 803 F.3d at 403 ("In any case, assuming *arguendo* that Jarkesy put forth a non-delegation doctrine challenge, he is wrong to assign it talismanic significance. He seems to assume that whenever a respondent in an administrative proceeding attacks a statute on its face, a district court has jurisdiction to hear the challenge, whereas the agency does not. That is mistaken.").

### 3.    Agency Expertise

"The final consideration within the *Thunder Basin* framework" is whether Axon's claims "fall[] outside the [FTC's] expertise." *Tilton*, 824 F.3d at 289. *See also Elgin*, 567 U.S. at 22. This factor looks to "whether agency expertise could be brought to bear on the questions presented." *Hill*, 825 F.3d at 1251 (internal quotation marks and alterations omitted). Like the other considerations, this consideration requires a full understanding of the *Thunder Basin* trilogy.

*Free Enterprise Fund* concluded that agency expertise played no role because the accounting firm's constitutional claims were not "fact-bound inquiries" and its statutory claims did "not require 'technical considerations of [agency] policy." 561 U.S. at 419 (citing *Johnson v. Robison*, 415 U.S. 361, 373 (1974)). In contrast, *Elgin* rejected the argument that the plaintiffs' constitutional arguments were outside the statutory scope of review because that argument "overlook[ed] the many threshold questions that may accompany a constitutional claim and to which the [agency] can apply its expertise." 567 U.S. at 22. Resolution of substantive arguments that did fall under the agency's expertise in favor of a plaintiff could "avoid the need to reach his constitutional claims." *Id.* In other words, the ability to "fully dispose of the case" before reaching the constitutional claims was an example of an agency's expertise being brought to bear. *Id.*

Again, *Free Enterprise Fund* and *Elgin* can be difficult to harmonize. The Courts of Appeals that have recognized this tension have generally opted to apply *Elgin*'s approach to the agency expertise consideration. *Bennett*, 844 F.3d at 187-88; *Hill*, 825

F.3d at 1250-51; *Tilton*, 824 F.3d at 289-290; *Jarkesy*, 803 F.3d at 28-29; *Bebo*, 799 F.3d at 772-73. Those courts reasoned that *Elgin* was the latest and more comprehensive assessment of the agency expertise factor, so its interpretation controlled. In following *Elgin*, those courts concluded that "[agency] expertise can otherwise be brought to bear" and that the plaintiffs' claims, including structural Article II claims, were subject to the statutory review scheme.

That said, *Free Enterprise Fund* and *Elgin* must be read as complementary, and thus the question isn't which standard controls, but where Axon's claims fall in the spectrum they create. The apparent conflict arises because *Elgin*, although its rule is clear, was not dealing with the sort of structural challenge that was raised in *Free Enterprise Fund*. If *Elgin*'s rule were applied as some courts have described it, agency expertise could be brought to bear in any case, which is an outcome that would conflict with *Free Enterprise Fund* and *Thunder Basin*. On the other hand, carving out a "*Free Enterprise Fund* exception" based on the content of a specific claim would run counter to *Elgin*'s reasoning, which is the Supreme Court's most recent formulation of the agency expertise consideration.

The key to harmonizing *Free Enterprise Fund* and *Elgin* is that the agency expertise analysis in *Free Enterprise Fund* was driven by the fact that, for the accounting firm to obtain judicial review through the statutory scheme, it would have had to force the issue by willfully and intentionally violating a rule and then raising the only defense possible— that the agency was unconstitutional. Only then would the accounting firm's claims be before the SEC and subject to judicial review. 561 U.S. at 491. In contrast, in *Elgin*, the agency had several avenues through which it could obviate the need to reach a constitutional question. 567 U.S. at 22.

The same is true here. Axon maintains it has done nothing wrong. The FTC, in applying its own expertise, may agree. Thus, as in *Elgin*, there may be no need for a federal appellate court to reach Axon's constitutional claims. Were Axon forced to forego any defense other than its constitutional claims, then, and only then, would Axon be in the same

position as the plaintiff in *Free Enterprise Fund*. Here, though, Axon has substantive defenses that may obviate the need to reach the constitutional question. It has not willfully broken a rule in order to vindicate its constitutional claims, nor does it need to do so. Thus, matters remain that would benefit from the FTC's expertise.

Axon argues the FTC cannot bring its expertise to bear because there is no way Axon can win—the FTC is so hopelessly biased that any litigant is doomed to lose. (Doc. 21 at 10.) Yet even if the FTC incorrectly rules against Axon during the administrative proceeding, "there are precious few cases involving interpretation of statutes authorizing agency action in which [a court's] review is not aided by the agency's statutory construction." *Mitchell v. Christopher*, 996 F.3d 375, 379 (D.C. Cir. 1993). Additionally, the FTC's alleged win rate is something of a red herring—nothing in the *Thunder Basin* trilogy suggests that a court conducting a jurisdictional-preclusion analysis must begin by gathering statistics concerning the particular agency's "win rate" and then use those statistics as a metric for evaluating whether the review being provided is truly meaningful.[13]

…

…

…

…

…

…

…

…

---

[13] In addition to lacking any support in the case law, this approach would also raise practical problems. For example, although Axon asserts that the FTC has a 100% win rate, some law review articles suggest that "FTC opinions that were appealed by losing respondents were reversed 20 percent of the time compared to a 5-percent reversal rate for such opinions appealed from district courts [in cases brought by the DOJ's Antitrust Division]." Terry Calvani & Angela M. Diveley, *The FTC at 100: A Modest Proposal for Change*, 21 GEO. MASON L. REV. 1169, 1181 (2014). During oral argument, Axon argued this law review article is misleading because "it includes cases that go all the way back to 1976" and there haven't been any appellate reversals of the FTC in recent years. It is unclear how courts would go about choosing which temporal cutoffs to employ if "win rate" statistics were truly part of the analysis.

Accordingly, **IT IS ORDERED** that:

(1)     Axon's complaint (Doc. 1) is **dismissed without prejudice** due to a lack of subject matter jurisdiction.

(2)     Axon's motion for preliminary injunction (Doc. 15) is **denied as moot**.

(3)     The Clerk of the Court shall enter judgment accordingly and terminate this action.

Dated this 8th day of April, 2020.

Dominic W. Lanza
United States District Judge