Pamela B. Petersen
Arizona Bar No. 011512
Gayathiri Shanmuganatha
Arizona Bar No. 030745
**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Fax: (480) 905-2027
ppetersen@axon.com
gshanmuganatha@axon.com
Secondary: legal@axon.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| AXON ENTERPRISE, INC., a Delaware Corporation, <br><br> Plaintiff, <br><br> v. <br><br> FEDERAL TRADE COMMISSION, a federal administrative agency, <br><br> and <br><br> LINA M. KHAN, REBECCA K. SLAUGHTER, ALVARO M. BEDOYA, in their official capacity as Commissioners of the Federal Trade Commission, <br><br> Defendants. | No. 2:20-cv-00014-PHX-DWL <br><br> **FIRST AMENDED COMPLAINT** |

## INTRODUCTION

1. Plaintiff Axon Enterprise, Inc. ("Axon") brings this case to challenge the unconstitutional structure and existence of Defendant Federal Trade Commission ("FTC" or "Commission"), which has ensnared Axon in unconstitutional agency proceedings. The FTC exists as a constitutional anomaly. In one hand, it wields a mighty sword—the power to not only prosecute cases, but to judge them, too; in the other, a massive shield—near-total protection from political accountability, with the Commissioners who direct it subject to neither democratic election nor at-will removal by the President. For decades, the agency has leveraged that power against American companies to extort "settlements" to avoid a rigged forum where they can never win.

2. Axon has now found itself in the agency's clutches. This case arises out of Axon's $13-million acquisition of Vievu LLC ("Vievu") in May 2018—a lawful transaction under the antitrust laws that had no anti-competitive effect. At the time of the acquisition, Vievu was a small, struggling, and financially failing body-worn camera ("BWC") supplier destined to leave the market. Vievu came to Axon (not the other way around) as a last resort, and Axon's purchase prevented massive BWC program disruptions for many law enforcement agencies.

3. Still, the FTC challenged the consummated transaction—not in a neutral federal court, but through its own biased administrative process that vests the Commission with the powers

of prosecutor, judge, and jury in violation of Article II; seeks to adjudicate core private rights in violation of Article III; and violates Axon's due process rights secured by the Fifth Amendment.[1]

**PARTIES**

4. For thirty years, Axon has been an equipment manufacturer and innovation leader in public safety technology, including in the BWC and digital evidence management space. Axon is a Delaware corporation with its principal place of business at 17800 N. 85th Street, Scottsdale, Arizona 85255.

5. The FTC is an administrative agency of the United States that performs Executive law enforcement functions—and more. Among other things, the FTC is empowered to initiate administrative proceedings pursuant to Section 5(b) of the Federal Trade Commission Act ("Act") and to seek injunctive relief in federal district court pursuant to Section 13(b) of the Act.

6. Lina M. Khan, Rebecca K. Slaughter, and Alvaro M. Bedoya (collectively "Commissioners") are Defendants in their official capacity as Commissioners of the FTC.

**JURISDICTION AND VENUE**

7. This action arises under the Constitution and laws of the United States, and this Court has federal question jurisdiction pursuant to 28 U.S.C. § 1331. *See generally Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175 (2023) (holding that the FTC's statutory review scheme

---

[1] This Amended Complaint removes, without prejudice, Axon's claim regarding the antitrust merits of the transaction (Doc. 1, Count 3) to allow Axon's purely legal constitutional challenges to the agency's structure and existence to proceed unimpeded. Should the FTC hereafter dismiss the administrative case (FTC Docket No. 9389) and refile its antitrust claims in federal court, Axon expressly reserves the right to advance the "first-filed doctrine" to require those claims be decided by this Court. Axon has given the FTC every opportunity to try the merits of the Vievu transaction in federal court, where it belongs, but to date it has refused.

does not displace a district court's federal-question jurisdiction over claims challenging the constitutionality of the FTC's structure or existence such as the ones alleged here).

8. Venue is proper under 28 U.S.C. § 1391(e).

## FACTUAL BACKGROUND

**A.  Axon's Acquisition of Vievu—A Failing Company**

9. Axon unveiled its first BWC in 2008 and revolutionized digital evidence collection, storage, and retrieval with its award-winning cloud-based evidence management software in 2009—a commercially successful solution years before its competition.

10. Vievu was founded in 2007 and acquired by Safariland LLC ("Safariland") in 2015. Safariland is a privately owned, reputable provider of safety and survivability products such as body armor and holsters.

11. By 2018, Safariland could no longer support Vievu, which was losing nearly $1 million per month. Much of Vievu's economic downfall was attributable to a huge, multi-year contract with the NYPD that was priced on unsustainable terms.

12. At the time Axon acquired it from Safariland, Vievu was essentially insolvent. It had crushing debt and the cash equivalent of less than three days' operating expenses. For that reason, several BWC competitors passed on the opportunity to purchase Vievu before Safariland approached Axon. As a testament to the company's failing status, on May 3, 2018, Safariland sold Vievu to Axon for approximately $13 million in cash and stock.

B.  **The FTC's Excessive and Unwarranted Settlement Demand**

13. In June 2018, the FTC sent Axon a letter announcing its investigation of the Vievu acquisition. Axon cooperated in the investigation and the FTC's extensive document demands for more than 18 months, at a cost of $1.6 million.

14. In December 2019, the FTC rejected Axon's pre-litigation offer to divest all assets it acquired from Vievu (as well as all Axon improvements to Vievu products) and to infuse a divestiture buyer with $5 million in working capital, among other transition accommodations.

15. But the FTC wanted more, demanding that Axon not only divest all acquired assets plus improvements, but also grant the buyer a license to Axon's BWC-related intellectual property—technology that Axon has invested more than 15 years and hundreds of millions of dollars building from the ground up.

16. Indeed, the FTC demanded a "blank check" divesture in which the FTC would unilaterally dictate settlement terms from a "menu" of all Axon customers and contracts (not just those won post-acquisition), Axon's own intellectual property and technology, Axon employees, and any ancillary services and support functions the FTC deemed necessary to stand up a virtual "clone" of Axon—something that Vievu never was nor could become without impermissible government intervention.

17. Axon resisted such "regulatory extortion" and filed this action on January 3, 2020, to protect its invaluable property from an unconstitutional government taking without statutory authority or due process of law.

C.     **The FTC's Home-Court Advantage**

18.    The FTC did not seek a federal court injunction and at no point did it request Axon to "hold separate" the Vievu business or assets acquired in the merger. Nor did the FTC choose to respond to the antitrust merits presented in Axon's initial complaint in this case (Doc. 1).

19.    Instead, hours after Axon filed suit, the FTC filed a separate administrative enforcement action (Docket No. 9389) in its own home court—a forum in which it always wins.

20.    As observed by a former FTC Commissioner, over nearly 20 years of administrative adjudication, the FTC always prevails:

> **[I]n 100 percent of cases where the administrative law judge ruled in favor of the FTC staff, the Commission affirmed liability; and in 100 percent of the cases in which the administrative law judge [ ] found no liability, the Commission reversed. This is a strong sign of an unhealthy and biased institutional process.** By way of contrast, when the antitrust decisions of federal district court judges are appealed to the federal courts of appeal, plaintiffs do not come anywhere close to a 100 percent success rate—indeed, the win rate is much closer to 50 percent.[2]

A perfect, decades-long administrative track record is far afield from any reasonable expectation of the outcomes of litigation. Indeed, the only plausible explanation for the Commission's immaculate record (as compared to its record in federal court) is the obvious one: the FTC's practices and procedures are so stacked against defendants that they simply cannot win. And a regulator who believes it cannot lose makes increasingly outrageous settlement demands.[3]

---

[2] *See* Joshua D. Wright, *Section 5 Revisited: Time for the FTC to Define the Scope of Its Unfair Methods of Competition Authority* at 6 (2015) (Doc. 15-2) (emphasis added).

[3] *See Axon*, 598 U.S. at 216 & n.4 (Gorsuch, J. concurring) (Because "few can outlast or outspend the federal government, agencies sometimes use this as leverage to extract settlement terms they could not lawfully obtain any other way."); *see also* Philip Hamburger, *Purchasing Submission:*

21. Holding fast to its "blank check" settlement demand, the FTC twice rejected signed term sheets with proposed divestiture buyers in 2020, leaving Axon no choice but to continue its defense of the administrative case while pursuing its constitutional claims in parallel.

22. Axon's resistance came at great cost. In the nine months between the filing of the FTC's administrative complaint and the Ninth Circuit's stay of those proceedings on October 2, 2020, just days before the administrative trial was set to begin, Axon spent approximately $20 million to protect its intellectual property—far more than the $13 million it spent to acquire Vievu.

**D.    Dual Agency Merger Review—Fundamentally Different Rights and Results**

23. The FTC and the Department of Justice ("DOJ") Antitrust Division have dual jurisdiction for reviewing mergers and acquisitions that may present substantive antitrust concerns. Section 7 of the Clayton Act, codified at 15 U.S.C. § 18, prohibits mergers and acquisitions where the "effect … may be substantially to lessen competition" or "tend to create a monopoly." Both the DOJ and FTC have authority to file suit to block a proposed transaction on antitrust grounds. The DOJ's authority is rooted in Section 15 of the Clayton Act, and the FTC's authority is based on Section 13(b) of the FTC Act, codified at 15 U.S.C. § 53(b).

24. Because the DOJ and FTC have dual jurisdiction to review mergers, the agencies have created an informal, non-public "clearance" process to decide how they will divvy up merger investigations—a black-box process not mandated by statute, subject to congressional scrutiny, or promulgated through notice-and-comment rulemaking.

---

*Conditions, Power, and Freedom* 223 (2021) (describing "regulatory extortion"); Wright (Doc.15-2 at 7) (the FTC's "combination of institutional and procedural advantages" enables it to "elicit a settlement even though the conduct in question very likely may not be anticompetitive").

25. From the perspective of the companies involved, which agency winds up reviewing a consummated transaction is often outcome determinative. Whereas the FTC has the option to sue in federal court <u>or</u> to commence an internal administrative hearing before a single Commissioner or an Administrative Law Judge ("ALJ"), 15 U.S.C. § 45(b), the DOJ can seek to unwind a consummated merger <u>only</u> by suing in federal district court.

26. The FTC's internal administrative hearing provides none of the substantive or procedural protections enjoyed by litigants in federal district court:

- Federal district court judges, and the juries they empanel, are impartial fact-finders who owe no allegiances to the DOJ and have life tenure and salary protection under Article III of the Constitution. In contrast, any FTC Commissioner (including one who voted to sue the defendant) may preside over the administrative hearing; the only other option is an ALJ appointed by the FTC and on the FTC's payroll.

- Federal court proceedings are governed by the Federal Rules of Evidence and Federal Rules of Civil Procedure. Neither applies in FTC administrative proceedings.

- The DOJ must satisfy a more rigorous substantive standard—finding that a merger or acquisition "substantially lessens competition"—whereas the FTC need only satisfy a less onerous "unfair competition" standard in the administrative context.

- Litigants in federal court can appeal adverse decisions to impartial circuit court judges. Recommended decisions rendered in FTC administrative proceedings must first be considered by the same FTC Commissioners who voted to sue the defendant in the first place.

- The DOJ cannot change the findings made by the district court when appealing a

- decision to the circuit court. However, the FTC Commissioners can ignore and completely reject or change the recommended merits decision rendered in the administrative proceedings *before* the defendant appeals to the circuit court.

- Different appellate standards of review also apply. The district court's factual findings in a DOJ case are reviewed for "clear error," whereas "[t]he findings of the Commission as to the facts, if supported by evidence, shall be *conclusive*." 15 U.S.C. § 45(c) (emphasis added).

27. The fact that similarly situated companies are subjected to substantially different rights and results based only on which agency happens to investigate their mergers underscores the FTC's constitutional infirmity.

28. The irreducible minimum of due process is "a fair opportunity to rebut the Government's factual assertions before a neutral decisionmaker." *Hamdi v. Rumsfeld*, 542 U.S. 507, 533 (2004). And a "meaningful" hearing, for purposes of due process, "requires a neutral and detached judge." *Id.* (quoting *Concrete Pipe & Prods. of Cal., Inc. v. Construction Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 617 (1993)). This basic protection—provided to everyone from public employees to enemy combatants—is denied to companies caught up in a merger challenge pursued by the FTC.

29. Given the inherently biased and unfair nature of administrative hearings at the FTC and the highly deferential review of its factual findings on appeal, it is no surprise that the FTC believes itself to be virtually untouchable in its internal arena. Thus, its "blank check" ultimatum.

### E.  The FTC's Lack of Political Accountability

30. Worse still, the FTC lacks any political check on how it exercises its unfair procedures against the companies that happen to fall within its bailiwick.

31. Although Article II "vest[s]" all "executive Power" in the President, U.S. Const. art. II, § 1, cl. 1, and charges the President alone with "tak[ing] Care that the Laws be faithfully executed," *id.*, art. II, § 3, the FTC enforces the antitrust laws outside of Presidential control.

32. As the Supreme Court has explained, the Framers concentrated Executive power solely in the President to "ensure … accountability" in the Executive Branch. *Printz v. United States*, 521 U.S. 898, 922 (1997). They recognized that the President could not carry out all of his duties alone, and therefore must be able to delegate some authority and responsibilities to others. *See Myers v. United States*, 272 U.S. 52, 117 (1926) ("[T]he President alone and unaided could not execute the laws," and must therefore "select those who [are] to act for him under his direction in the execution of the laws."); *see also* U.S. Const. art. II, § 2, cl. 2 (Appointments Clause).

33. But the Framers feared the obvious mischief that could be worked by such unelected individuals armed with law-enforcement power. Thus, the Framers struck a balance. On the one hand, they allowed the President to delegate power; on the other, they took care to ensure that the President was always the one with whom "the buck stops." *Free Enterprise Fund v. PCAOB*, 561 U.S. 477, 493 (2010). Accordingly, the Supreme Court has recognized that, "as a general matter," the President must have the "power to remove" principal officers "who assist him in carrying out his duties." *Id.* at 513-14. Indeed, if "any power whatsoever is in its nature Executive, it is the power of appointing, overseeing, and controlling those who execute the laws." *Id.* at 492 (quoting 1 *Annals of Cong.* 463 (1789) (Joseph 8 Gales ed., 1834) (Madison)).

34. Just as the President's ability to select administrative officers "is essential to the execution of the laws by him, so must be his power of removing those for whom he cannot continue to be responsible." *Myers*, 272 U.S. at 117. That removal power is crucial to the democratic legitimacy of the Executive Branch in two ways. First, it makes inferior officers less likely to deviate from the President's (and hence, the People's) will. Second, and perhaps more important, the removal power gives the People political recourse if they are displeased with the actions taken by those who enforce federal law. Although the People cannot vote for (or against) an Executive officer directly, they can vote for (or against) the President, who bears ultimate responsibility for federal law enforcement. Those two mechanisms for accountability work together to ensure that those who carry out the work of the Executive Branch do so in a way that reflects the People's will, and not their own.

35. FTC Commissioners, however, are shielded from at-will Presidential removal—and hence from the key mechanism of democratic accountability—in violation of Article II. The FTC is headed by five Commissioners, nominated by the President and confirmed by the Senate, each serving a seven-year term. 15 U.S.C. § 41. But once appointed, the Commissioners are not subject to removal by the President, absent a finding of "inefficiency, neglect of duty, or malfeasance in office." *Id.* This means that FTC Commissioners are not politically accountable for their actions. So long as the Commissioners stop short of "malfeasance," the President can do nothing but stand by and watch, no matter how much he disagrees with them.

36. Moreover, because the FTC-appointed ALJ cannot be removed except for "good cause" in accordance with statutory procedures, 5 U.S.C. § 7521(a), (b)(1), an impermissible "dual-layer of protection" even further restricts Executive control. *See Free Enter. Fund*, 561 U.S.

11

at 495 (holding unconstitutional similar multi-layer tenure protection where Board members appointed by SEC could only be removed by those Commissioners, not the President, for cause).

37.     This means that crucial law enforcement actions, sometimes with massive consequences for the American economy (and here, for public safety), are currently taken by individuals not elected by the People and not controlled by the President. That runs directly contrary to Article II and the democratic principles underlying the Constitution.

**COUNT I**

**(Dual-Layer Removal Protections Afforded FTC ALJs Violate Article II)**

38.     Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

39.     On January 6, 2020, the FTC's Chief ALJ, D. Micheal Chappell, was appointed to preside over the in-house proceedings in *Axon*, FTC Docket No. 9389.

40.     On September 3, 2020, the Commission denied Axon's motion to disqualify ALJ Chappell, which argued his dual-for-cause tenure protection violates Article II of the U.S. Constitution and the separation of powers.

41.     As an FTC ALJ, ALJ Chappell exercises significant authority pursuant to the laws of the United States, including receiving evidence, conducting hearings, administering oaths, ruling on motions, regulating the conduct of parties and counsel, and making and filing recommended decisions. 16 C.F.R. § 3.42(c).

42.     ALJ Chappell is thus an Officer of the United States under Article II.

43.     Indeed, under a straightforward application of *Lucia v. SEC*, 138 S. Ct. 2044 (2018), ALJ Chappell is a principal officer subject to the Appointments Clause.

44. But, as an FTC ALJ, ALJ Chappell may not be removed except for good cause, established and determined by someone other than the President—namely, the Merit Systems Protection Board ("MSPB"). 5 U.S.C. § 7521(a). And the President may not remove MSPB members except for "inefficiency, neglect of duty, or malfeasance in office." *Id.* § 1202(d).

45. As a result, neither the President, nor anyone directly responsible to him, has the power to remove ALJ Chappel at will—or even to determine whether good cause exists for his removal. That is contrary to Article II under *Free Enterprise Fund*.

46. The dual-layer protections afforded ALJ Chappell are unconstitutional, and any actions taken against Axon under this present structure are invalid.

## COUNT II

**(For-Cause Removal Protections Afforded FTC Commissioners Violate Article II)**

47. Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

48. Article II is also violated by the single-layer constraint on the President's removal of FTC Commissioners.

49. FTC Commissioners may be removed only for "inefficiency, neglect of duty, or malfeasance in office." 15 U.S.C. § 41.

50. Article II makes a single President responsible for the actions of the Executive Branch. The President's removal power is therefore the rule, not the exception.

51. For-cause removal protections are limited to multimember expert agencies that do not wield substantial executive power.

52. The FTC wields substantial executive power.

13

53. The FTC performs Executive law enforcement functions. Indeed, the exercise of rulemaking and adjudicative functions, when performed by the Executive Branch, constitutes the exercise of Executive power.

54. Article II requires that Executive officials exercising law-enforcement power be removable at will by the President. Although the FTC clearly exercises law-enforcement power—including but not limited to Axon's case—its Commissioners are shielded from at-will removal.

55. Because the FTC's structure violates Article II, any actions taken against Axon under its present structure—including voting out the administrative complaint—are invalid.

## COUNT III

### (The FTC's Structure Violates Article III)

56. Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

57. Article III commands that "[t]he judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." U.S. Const. art. III, § 1.

58. Cases involving deprivations of life, liberty, or property fall within the core of the judicial power and must be resolved by Article III courts.

59. Separate and apart from the divestiture of assets acquired from Vievu, the FTC's administrative complaint against Axon seeks the "divestiture or licensing of other assets, including but not limited to those necessary for research and development, production, marketing and sale, and servicing of Respondent Axon's BWC Systems products." (Complaint at 12, ¶ 1.)

60. The FTC's effort to compel the transfer of Axon's independently created intellectual property to another entity, among other demands, implicates core private rights.

61. Because federal administrative agencies are part of the Executive Branch, they do not have power to adjudicate claims involving core private rights.

62. When private rights are at stake, as here, full Article III adjudication is required.

63. The appellate review scheme of 15 U.S.C § 45(c) improperly vests the FTC with primary authority to adjudicate core private rights with only highly deferential judicial review on the back end. Indeed, "if supported by evidence," the Article III court must treat the FTC's findings of fact as "conclusive" and cannot take its own evidence. *Id.*

64. This "appellate review model" violates the separation of powers by placing adjudicatory authority over core private rights—a judicial rather than executive power—within the authority of Article II agencies. It violates Article III by compelling the Judiciary to defer to administrative agencies regarding matters within the core of the Judicial Vesting Clause. It violates Axon's due process rights by empowering entities that are not courts of competent jurisdiction to deprive citizens of core private rights. And it runs afoul of the Seventh Amendment by allowing an administrative agency to adjudicate core private rights without a jury.

65. Accordingly, the FTC's structure and existence as it relates to the adjudication of core private rights is unconstitutional.

**COUNT IV**

**(The FTC's Combined Function Structure Violates Axon's Due Process Rights)**

66. Plaintiff restates and incorporates by reference each allegation of the preceding paragraphs.

67. It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process. And this requirement applies to administrative agencies as well as to courts.

68. The FTC's structure, which combines multiple critical functions—investigatory, prosecutorial, and adjudicative—in a single agency, violates Axon's due process rights.

69. An administrative proceeding in which the FTC acts as prosecutor, judge, and jury deprives Axon of the ability to make its case before a neutral arbiter.

70. The fact that FTC Commissioners both initiate and finally adjudicate their administrative complaints not only violates the adage that justice must satisfy the appearance of justice, but constitutes impermissible prejudging of the merits of the action.[4]

71. Unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case.

72. Far more than the mere combination of investigative and adjudicative functions, the FTC's inherently biased structure has created an unprecedented near perfect win streak in administrative proceedings in the past quarter-century.

73. With a federal court win rate closer to 50% when Article III protections are in place, special facts and circumstances exist demonstrating an intolerably high risk of unfairness in FTC administrative proceedings.

74. Accordingly, the FTC's combined-function structure is unconstitutional.

---

[4] *See* Andrew N. Vollmer, *Accusers as Adjudicators in Agency Enforcement Proceedings*, 52 U. Mich. J. L. Ref. 103, 145 (2018) (explaining in SEC context that when "Commissioners have a direct, personal role in critical decisions of initiating enforcement cases by the agency they head" it "create[s] an unconstitutional potential for bias") (Doc.15-2 at 71).

16

**PRAYER FOR RELIEF**

WHEREFORE, Axon respectfully requests that this Court enter judgment in its favor and against the FTC as follows:

a. Hold the dual-layer insulation of FTC ALJs from Presidential control contrary to Article II;

b. Hold the removal procedures governing Commissioners contrary to Article II;

c. Hold the FTC's structure unconstitutional;

d. Direct the Commission to dismiss the administrative complaint against Axon;

e. Award Axon its reasonable costs incurred in bringing this action; and

f. Award such other and further relief the Court deems just and proper.

Dated: August 30, 2023                    Respectfully Submitted,


/s/ Pam Petersen
Pamela B. Petersen
Arizona Bar No. 011512
Gayathiri Shanmuganatha
Arizona Bar No. 030745
**Axon Enterprise, Inc.**
17800 N. 85th Street
Scottsdale, AZ 85255-9603
Telephone: (623) 326-6016
Facsimile: (480) 905-2027
ppetersen@axon.com
gshanmuganatha@axon.com
Secondary: legal@axon.com

*Attorneys for Plaintiff Axon Enterprise, Inc.*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 30, 2023, the foregoing was filed electronically with the Clerk of Court to be served by operation of the Court's CM/ECF system upon all counsel of record in the above-captioned case.

                                           */s/ Pam Petersen*
                                           Pamela B. Petersen